**In re the Matter of the Termination of the Parent–Child Relationship of M.M., a Parent, and M.M., a Child.**

**M.M., Appellant–Respondent,**

v.

**Elkhart Office of Family and Children, Appellee–Petitioner.**

**No. 20A04–0003–JV–124.**

Court of Appeals of Indiana.

July 25, 2000.

Nancy A. McCaslin, McCaslin & McCaslin, Elkhart, Indiana, Attorney for Appellant.

Kathleen B. Dvorak, Dvorak & Dvorak, South Bend, Indiana, Attorney for Appellee.

## OPINION

BROOK, Judge

### Case Summary

Appellant-respondent M.M. ("Mother") appeals the trial court's order granting the petition of appellee-petitioner Elkhart Office of Family and Children ("the OFC") for the involuntary termination of her parental rights over her child ("Son"). We affirm.

### Issues

Mother presents three issues, which we consolidate and restate as:

I. whether the trial court appropriately denied Mother's motion to dismiss the termination of parental rights petition; and,

II. whether the OFC presented clear and convincing evidence to support the termination of Mother's parental rights.

1. The record reveals that the parental rights of Mother's parents were terminated at some

### Facts and Procedural History

The facts most favorable to the termination reveal that Mother had been in foster care since she was eight or nine years old.[1] She was eventually placed in a group home in Ohio because, as Mother explained, "I was in so much trouble, and they was running out of places to put me." Indeed, she had run away five or ten times prior to her placement in the Ohio home. While at the home, fourteen-year-old Mother became pregnant by another resident. In May 1997, Mother, then four months pregnant, ran away from the home. She proceeded to stay with people she had met when she was "walking through the neighborhood one day." She received no prenatal care after leaving the group home, used drugs and alcohol, smoked, and engaged in sexual activity. Although Mother surrendered to authorities on May 27, 1997, she ran away again two days later.

On July 18, 1997, Mother went into premature labor and gave birth to Son, who weighed one pound, fourteen ounces. Mother used a false name at the hospital because she "was a runaway and [she] knew they would lock [her] up." Mother was placed in a lock-down facility after Son's birth. On July 21, 1997, the OFC sought an emergency order for protective custody of Son. The next day, the court held a hearing, which Mother attended telephonically and which her guardian ad litem ("guardian") attended in person. The court found probable cause that Son was a child in need of services ("CHINS") "in that he was born to a ward of the Court," and that Mother had tested positive for marijuana at Son's birth.

Son was transferred to a neonatal intensive care unit, moved to a different hospital, and eventually released. In October 1997, the OFC made a joint placement of Mother and Son. This placement ceased after a few days when Mother did not get

point.

along with the foster parents. On October 20, 1997, the OFC placed Mother and Son in the McFarley foster home, where they stayed until March 19, 1998.

On October 31, 1997, the OFC filed a petition alleging that at that time fourteen-year-old Mother was unable to care for Son, a premature infant. Mother admitted and the court eventually found that Son was a CHINS. At a January 1998 dispositional hearing, which Mother and her guardian attended, the parties filed an agreement and stipulation, and Mother received an "Advisement of Rights" form. The order required that Son remain in foster care with Mother and that Mother participate in unsupervised visits, parenting classes, and therapy, and attend high school.

Mother and Son left the McFarley foster home on March 19, 1998, and went for a week of respite care. On March 27, 1998, the OFC placed Mother and Son at the LeMonte foster home, where they resided until mid-December 1998. On October 16, 1998, the court held a review hearing, which Mother and her guardian attended. Thereafter, the court issued two orders. In the first order, the court found:

(1) Son was "doing well in his current placement and services;"

(2) Mother "has exhibited some inappropriate behaviors during the past six months;"

(3) Mother has "initiated contacts with her biological parents;" and

(4) "[r]easonable efforts have been made to reunite" Son with the family.

The court ordered that Son's current foster care placement and services continue; referral be made to monitor Mother's progress in caring for Son; and Mother complete parenting assessment, parenting classes, and counseling sessions. In the second order, the court stated:

[Mother] demonstrates in the report to the Court, as well [as] her conduct and statements in the Court room, that she is still enamored with the lifestyle of gang activity, she is resentful of authority exercised upon her, and that she is on a collision course for more difficulties in her life unless she can alleviate the gang activity.

Accordingly, the court requested that the possibility of Mother's involvement in the "Daily Reporting Program" be explored.

On December 17, 1998, Mother was sent to Juvenile Detention because of an adjudication for battery on her foster mother. Son remained in foster care. On December 21, 1998, Mother was moved to Bashor Shelter Care. On January 19, 1999, the court held a ninety-day review hearing, which Mother and her guardian attended. That day, the court issued its order, noting that Mother should complete parenting assessments and classes, but that daily reporting should be a first priority. The court reiterated that Mother must participate in school, counseling, and foster care. Also, the court scheduled a permanency hearing and appointed a public defender for Mother. A joint foster home for Mother and Son was then arranged. However, nine days after the review hearing, Mother ran away from the Bashor facility.

On April 28, 1999, police picked up Mother for shoplifting a pregnancy test. Mother indicated that she recently suffered a miscarriage. She spent the next four months at the Indiana Girls School. On July 16, 1999, the OFC filed a permanency report, informing the court, *inter alia*, that Mother had made no effort since December 1998 to see or ask about Son. On July 22, 1999, the OFC filed a petition to involuntarily terminate Mother's parental rights. Again, the court appointed counsel for Mother. At an October 25, 1999 evidentiary hearing, Mother's counsel filed and the court denied a motion to dismiss the termination petition. The court terminated Mother's parental rights in December 1999.

## Discussion and Decision

### I. Motion to Dismiss

In Mother's motion to dismiss the termination petition and now on appeal, she

argues that the court erroneously failed to appoint counsel to her during the CHINS action. She claims that this failure violated her Fourteenth Amendment due process right, contravened then-existing Indiana statutory law, and resulted in fundamental error.

"[T]he right to appointment of counsel as a due process protection is not absolute." *Holmes v. Jones,* 719 N.E.2d 843, 846 (Ind.Ct.App.1999).

> The Fourteenth Amendment to the United States Constitution requires that no person shall be deprived of life, liberty, or property without due process of law. Although due process has never been precisely defined, the phrase expresses the requirement of "fundamental fairness." In the context of representation of counsel, the fundamental fairness requirement does not mandate that counsel shall be appointed in all cases. To the contrary *there is a presumption against appointment of counsel where the litigant's physical liberty is not at stake.* "[A]n indigent litigant has a [Fourteenth Amendment due process] right to appointed counsel only when, if he loses, he may be deprived of his physical liberty." This presumption may be overcome, however, where other elements of due process so require. In determining whether an indigent litigant may be entitled to court appointed counsel we must first evaluate (1) the private interests at stake, (2) the government's interest, and (3) the risk that the procedures used will lead to an erroneous decision. Next, we balance these elements against each other and weigh them against the presumption that there is a right to appointed counsel only where the indigent, if unsuccessful, may lose his or her personal freedom.

**2.** Indisputably, Mother was represented by counsel during the termination proceedings.

**3.** In reaching this conclusion, we distinguish *Reich v. Crawford County Dep't of Public Welfare,* 587 N.E.2d 1341 (Ind.Ct.App.1992). There, we concluded that the welfare depart-

*E.P. v. Marion County Office of Family and Children,* 653 N.E.2d 1026, 1031 (Ind. Ct.App.1995) (citations omitted) (emphasis added). We apply the *E.P.* three-part test below.

As for the private interest, "the courts of this state have long and consistently held that the right to raise one's children is essential, basic, more precious than property rights, and within the protection of the Fourteenth Amendment to the United States Constitution." *Id.* On the other hand, the State has a "compelling interest in protecting the welfare of children and advancing their best interests." *J.W. v. Hendricks County Office of Family and Children,* 697 N.E.2d 480, 484 (Ind.Ct.App.1998). In considering the risk that the procedure used will lead to an erroneous result, we do not question that "CHINS proceedings are a complex legal matter potentially involving several court hearings." *See E.P.,* 653 N.E.2d at 1032. We also acknowledge that litigating any case, including a CHINS matter, without the benefit of counsel may increase the risk of an erroneous decision. *Id.* "However, unlike a termination proceeding,[2] or a paternity proceeding, where an erroneous result obviously would be disastrous, an erroneous CHINS adjudication has a far less disastrous impact on the parent-child relationship." *See id.* (citations omitted). Even assuming without deciding that the risk of an erroneous CHINS adjudication is great when an indigent parent has no counsel to assist her through the various stages of the proceedings, we do not view the risk as outweighing the presumption against court-appointed counsel. *See id.* Hence, Mother's due process rights were not violated by the court's failure to appoint counsel for her in the CHINS proceeding.[3]

ment's and the court's failure to follow statutory procedures in a CHINS proceeding, when exacerbated by the mother's diminished mental capacity, denied the mother due process.

Mother's statutory argument requires that we examine the Code provisions applicable at the time of the CHINS proceeding. Indiana Code Section 31–6–7–2(b) provided:

> If a parent in proceedings to terminate the parent-child relationship does not have an attorney who may represent him without a conflict of interest, and if he has not lawfully waived his right to counsel ... the juvenile court shall appoint counsel for him.... The court may appoint counsel to represent any parent in any other proceeding.

Under the foregoing statute, appointment of counsel in a CHINS proceeding is a matter left to the discretion of the trial court. *E.P.*, 653 N.E.2d at 1033; *Smith v. Marion County DPW*, 635 N.E.2d 1144 (Ind.Ct.App.1994), *trans. denied*. Thus, we analyze whether the trial court abused its discretion in not appointing counsel for Mother.

Whether the trial court abuses its discretion in declining to appoint counsel in a CHINS proceeding depends on the unique facts and circumstances of each case. *See E.P.*, 653 N.E.2d at 1033. "If lack of counsel is likely to lead to particularly damaging uncontested allegations and if such allegations be deemed established and not subject to subsequent challenge, those allegations might virtually assure a subsequent termination decision." *Id.* In such situations the trial court might well abuse its discretion by failing to appoint counsel for an indigent parent. *See Smith*, 635 N.E.2d at 1151. In the OFC's CHINS petition, it alleged that Son "was born to [Mother], a 14 year old ward of Elkhart County. [Son] was born weighing 1 lb 14 oz. [Mother] is unable at the present time to care for Son alone." While Mother admitted the general allegation that Son was a CHINS, we cannot say that the uncontested allegations "virtually assure[d] a subsequent termination decision." *See E.P.*, 653 N.E.2d at 1033. Rather, it was the evidence of what occurred after the CHINS adjudication that

eventually led to termination of Mother's parental rights.

Indiana Code Section 34–1–1–3 provided in relevant part:

> Any poor person not having sufficient means to prosecute or defend an action may apply to the court in which the action is intended to be brought, or is pending, for leave to prosecute or defend as a poor person. The court, if satisfied that such person has not sufficient means to prosecute or defend the action, shall admit the applicant to prosecute or defend as a poor person, and shall assign him an attorney.

To invoke this statute, the litigant must request appointment of counsel based on her economic status. *Gee v. State*, 508 N.E.2d 787, 789–90 (Ind.1987). Because Mother did not make a request for counsel, this statute is inapplicable.

Moreover, we are unpersuaded by Mother's fundamental error claim. To overturn a trial court ruling based on fundamental error, we must conclude that the error was "a clearly blatant violation of basic and elementary principles, and the harm or potential for harm therefrom must be substantial and appear clearly and prospectively." *S.M. v. Elkhart County Office of Family and Children*, 706 N.E.2d 596, 600 (Ind.Ct.App.1999). Here, even if there was error, Mother has failed to demonstrate and we do not see how the result in her termination case would have been different if counsel had been appointed during the CHINS proceeding.

## II. Clear and Convincing Evidence to Terminate

Mother also asserts that the OFC failed to present sufficient evidence to terminate her parental rights. When reviewing an order terminating parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses. *Stone v. Daviess County Div. of Children and Family Servs.*, 656 N.E.2d 824, 827 (Ind.Ct.App.1995), *trans. denied*.

Instead, we consider only the evidence most favorable to the trial court's decision and the reasonable inferences to be drawn therefrom. *Id.* Where the trial court has entered findings of fact, we will not set aside the trial court's findings and judgment unless clearly erroneous. *Id.*

"The purpose of terminating parental rights is not to punish parents but to protect their children." *Matter of A.N.J.*, 690 N.E.2d 716, 720 (Ind.Ct.App. 1997), *trans. denied.* A parent's right to establish a home and raise her children, although of constitutional dimension, is not absolute. *Wardship of J.C. v. Allen County Office of Family and Children,* 646 N.E.2d 693, 694 (Ind.Ct.App.1995), *trans. denied.* The parent's rights must be subordinated to the child's interest in determining an appropriate disposition of a petition to terminate parental rights. *Shaw v. Shelby County Dep't of Pub. Welfare,* 584 N.E.2d 595, 601 (Ind.Ct.App.1992).

The termination statute requires the OFC to show by "clear and convincing evidence" that:

(A) one of the following exists:

(i) the child has been removed from the parent for at least six (6) months under a dispositional decree; . . .

(B) there is a reasonable probability that:

(i) the conditions that resulted in the child's removal or the reasons for placement outside the parent's home will not be remedied; *or*

(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

IND.CODE § 31–35–2–4(b)(2) (emphasis added); *Doe v. Daviess County Div. of Children and Family Servs.,* 669 N.E.2d 192, 194 (Ind.Ct.App.1996), *trans. denied.* Mother challenges the sufficiency of the evidence supporting Indiana Code Section 31–35–2–4(b)(2)(A), (B), and (C).

Regarding the "removal from parent" requirement, we have stated that removal refers to a dispositional decree "which authorizes an out-of-home placement." *Tipton v. Marion County Dep't of Public Welfare,* 629 N.E.2d 1262, 1266 (Ind.Ct.App.1994). Examining the removal element here, we acknowledge the unusual nature of this case. Mother, a CHINS herself, has been in foster care or on the run since before Son's birth. Hence, Mother has never provided Son with a home from which he could be removed. Instead, within days of Son's birth, the OFC petitioned for and the court granted an emergency protective custody order for Son. Upon his release from the hospital, Son was placed in a foster home. Everyday thereafter, Son has resided in foster care with foster parent(s) pursuant to the emergency order and then the CHINS adjudication. During some of this time, Mother has been placed with Son in foster care. However, as noted, Son, as a CHINS, has always been under the supervision of foster parent(s), and in turn, the OFC.

Further, by the time the OFC filed the termination petition in July 1999, Son had resided in court ordered foster care without Mother for more than six months. Specifically, on December 17, 1998, Mother went to Juvenile Detention because of the battery on her foster mother. Days later, Mother was moved to the Bashor facility, where she resided until January 28, 1999, when she ran away. The OFC did not know of Mother's whereabouts until police picked her up for shoplifting on April 28, 1999. Mother spent the next four months, through August 1999, at the Indiana Girls School. Under these particular circumstances, Son was "effectively" removed from Mother for at least six months. *See Wagner v. Grant County Dep't of Public Welfare,* 653 N.E.2d 531, 533 (Ind.Ct.App. 1995) (concluding that child was removed from father's custody for at least six

months under dispositional decree, though mother had custody of child and father was incarcerated at time of removal, as child was "effectively removed" from both parents and remained in foster care for over six months before petition to terminate father's rights was filed).

Turning to Indiana Code Section 31–35–2–4(b)(2)(B), we stress that a court "need not wait until a child is irreversibly harmed such that his physical, mental and social development is permanently impaired before terminating a parent-child relationship." *In re A.A.C.*, 682 N.E.2d 542, 544 (Ind.Ct.App.1997). To "determine whether there is a reasonable probability that the conditions which resulted in the removal of the children will not be remedied, the trial court should judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re L.S., D.S. and A.S.*, 717 N.E.2d 204, 209 (Ind.Ct.App.1999), *trans. denied.* "Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child." *Id.* "When making its determination, the trial court can reasonably consider the services offered by the [OFC] to the parent and the parent's response to those services." *A.A.C.*, 682 N.E.2d at 544.

 The court found and the record supports the following facts:

1. Mother is a ward of the court.

2. For all practical purposes, Son has been a ward of the court and in foster care since birth.

3. Mother fled from the Bashor home and her whereabouts were unknown for three months, during which time Son remained in foster care.

4. Mother evinces a pattern of periodically running away from situations and placements that she finds difficult.

5. Extensive services were provided or offered to Mother throughout the twenty-seven months since Son's birth; however, Mother did not adequately participate in or benefit from those services.

6. Mother, having no driver's license and being unemployed, has not contributed to Son's or her own financial support.

7. Mother is unable to provide Son with adequate food, clothing, shelter, and medical/dental care.

8. Mother has engaged in battery.

9. Despite being underage, Mother smokes regularly and has used alcoholic beverages a few months before the termination hearing.

Although not stated in the findings, the record also indicates that Mother smoked marijuana, engaged in truancy and shoplifting, and never had sole responsibility for Son. The court concluded: "There is a reasonable probability that the conditions that resulted in the removal of [Son] from [Mother's] care, custody and control or reasons for placement away from [Mother] will not be remedied and the continuation of the parent-child relationship poses a threat to [Son's] well being." Under the circumstances, we cannot say the court's conclusion was clearly erroneous.

We next address the "best interests" requirement. Here, the person who was the case manager until five weeks before the termination hearing testified that termination was in Son's best interests. In addition, Son's court-appointed special advocate testified that termination was in Son's best interests. The testimony of those two individuals, coupled with the evidence that the conditions that resulted in the effective removal of Son from Mother's care or reasons for placement away from Mother will not be remedied and the continuation of the parent-child relationship poses a threat to Son's well-being, was sufficient to show by clear and convincing evidence that termination was in Son's best interest. *See Ramsey v. Madison County Dep't of Family and Children,* 707

N.E.2d 814, 818 (Ind.Ct.App.1999) (concluding that a counselor's testimony that it would be in the child's best interest to terminate the parent-child relationship, "along with the evidence that the condition will not be remedied and that the relationship poses a threat to Child" was sufficient to show by clear and convincing evidence that termination was in child's best interest).

▮ Finally, Mother contends that some of the court's findings are incorrect or unsupported by the record. We agree that there are minor errors in certain findings. However, in light of the fact that the accurate findings support the termination, any erroneous findings are harmless error. *See Matter of A.C.B.*, 598 N.E.2d 570, 573–74 (Ind.Ct.App.1992) (holding that error in trial court's factual findings that father stated he would provide for child financially through illegal drug sales while in prison was not of such magnitude that it called into question court's conclusion that child's best interests would not be served by returning to father's care, even if that were possible, so as to require reversal of termination of father's parental rights). To reiterate, we reverse a termination of parental rights only upon a showing of clear error, that is, one which leaves us with a definite and firm conviction that a mistake has been made. *See Ramsey*, 707 N.E.2d at 818. We find no such error here.

Affirmed.

DARDEN, J., and MATTINGLY, J., concur.