742 N.E.2d 509 (2001)
In the Matter of the Termination of the Parent/Child Relationship of J.T., A Minor Child, and Samantha Timm, Natural Mother and Mark Tawney, Alleged Father.
No. 46A03-0007-JV-244.
Court of Appeals of Indiana.
January 17, 2001.
Transfer Denied April 23, 2001.
*510 Donald W. Pagos, Sweeney, Dabagia, Thorne, Janes & Pagos, Michigan City, Indiana, Attorney for Appellant.
Greta Stirling Friedman, Friedman & Associates, P.C., LaPorte, Indiana, Attorney for Appellee.

OPINION
KIRSCH, Judge.
Samantha Timm appeals the trial court's decision terminating her parental rights to her son, J.T. She raises two issues for review, which we restate as follows:
I. Whether sufficient evidence supports the trial court's determination that there is a reasonable possibility that the conditions resulting in J.T.'s removal will not be remedied.
*511 II. Whether the trial court erred in terminating the natural father's parental rights pursuant to a voluntary consent.
We affirm.

FACTS AND PROCEDURAL HISTORY
On July 3, 1995, J.T. was born to Timm. Mark Tawney's paternity of J.T. was later established. After receiving complaints about possible neglect, the Office of Family and Children (OFC) became involved with the family. At the time, Timm was living in a condemned house that had no running water or electricity. J.T. was adjudged to be a child in need of services and was placed in foster care.
Throughout the next several years, the OFC offered Timm substantial services with the goal of reunifying the family, including homemaker services, child care and safety instruction, transportation, therapy, and visitation. For several months in 1998, J.T. was returned to Timm's care, only to be removed again because of concerns for his safety. None of the services offered to Timm produced sustained improvement. Timm has a borderline low I.Q. of 79 and suffers from adult attention deficit disorder.
OFC eventually filed a petition to terminate the parental rights of Timm and Tawney. Tawney appeared and voluntarily consented to the termination. The trial court held the matter under advisement pending resolution of Timm's case.
After a four-day trial at which fifteen witnesses testified, the trial court terminated Timm's rights as well. Timm now appeals.

DISCUSSION AND DECISION
When reviewing an order terminating parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses. In re L.S., 717 N.E.2d 204, 208 (Ind.Ct.App.1999), trans. denied (2000); Matter of A.N.J., 690 N.E.2d 716, 720 (Ind.Ct.App.1997). Instead, we consider only the evidence most favorable to the trial court's decision and the reasonable inferences to be drawn therefrom. In re M.M., 733 N.E.2d 6, 11-12 (Ind.Ct.App. 2000); In re L.S., 717 N.E.2d at 208. Where the trial court has entered findings of fact, we will not set aside the trial court's findings and judgment unless clearly erroneous. In re M.M., 733 N.E.2d at 11-12.
The purpose of terminating parental rights is not to punish parents but to protect their children. Id. The parents' constitutional rights to raise their children must be subordinated to the child's interest in determining an appropriate disposition of a petition to terminate parental rights. Id.
In order to terminate parental rights, IC XX-XX-X-X(b)(2) provides that a trial court must find that the OFC has proven by clear and convincing evidence that:
"(A)(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
...
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;
(C) termination is in the best interests of the child; and
(D) there is a satisfactory plan for the care and treatment of the child."
Id.
Timm challenges only the sufficiency of the evidence regarding the second subsection, that there is a reasonable probability that the conditions that resulted in the child's removal from the parent's home will not be remedied. Timm does not challenge the trial court's finding that *512 continuation of the parent-child relationship posed a threat to J.T.'s well-being. The statute is written in the disjunctive; it requires the trial court to find only one of the two requirements of subsection (B) by clear and convincing evidence. In re L.S., 717 N.E.2d at 209. Standing alone, the finding that the parent-child relationship posed a threat to the well-being of the children satisfies the requirement listed in subsection (B). Id. As only one of these two factors is necessary to support a termination, even if the evidence on the challenged factor was insufficient, there is still an adequate independent basis for terminating Timm's parental rights because a continuation of the parent-child relationship poses a threat to J.T.
Nonetheless, we review the evidence supporting these findings. J.T. was originally removed from Timm's home in July 1996 because Timm had no stable residence and was unable to meet one-year-old J.T.'s needs for food, shelter, and personal hygiene. J.T. was returned to Timm's care in January 1998 and was removed a second time in August 1998 because Timm failed to recognize or respond to serious concerns about J.T.'s safety.
To determine whether there is a reasonable probability that the conditions which resulted in the removal of the children will not be remedied, the trial court should judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions. In re M.M., 733 N.E.2d at 13. Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Id.; In re B.D.J., 728 N.E.2d 195, 201 (Ind.Ct.App.2000). The trial court can also reasonably consider the services offered by the OFC to the parent and the parent's response to those services. In re M.M., 733 N.E.2d at 13; In re B.D.J., 728 N.E.2d at 201. A court need not wait until a child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating a parent-child relationship. In re M.M., 733 N.E.2d at 13.
Through the trial testimony of multiple witnesses, the evidence established that Timm's involvement with OFC and the services it offered began in September 1995, shortly after J.T.'s birth, and continued for nearly four years with no sustained improvement before OFC decided to petition to terminate Timm's parental rights. Donna Brown, a caseworker who investigated the complaints that resulted in J.T.'s initial removal, testified that J.T. was placed in foster care because the OFC received complaints that Timm showed no insight into how to properly feed her young children and was not seeking medical care for her sick infant. As a result of this, J.T. and his sister were placed in foster care. Thus, she stated that the children were originally removed from Timm's care because of life and health endangering neglect in that their needs for food, housing, cleanliness, and medical care were not being met.
Kay Faulstich, a service provider who assisted Timm for nearly one year in obtaining parenting skills, testified that Timm's response to her suggestions was uneven. At times Timm would seem to understand, other times she would argue with Faulstich. Overall, she stated that Timm was often inattentive to J.T., was inconsistent with J.T., and never gained any lasting insight from her eleven months of work with her.
Julie Ebert, a family support worker who assisted Timm with her parenting skills, agreed with Faulstich's assessment. She testified that Timm did not understand basic child care concepts, like choosing age appropriate toys, providing discipline and love, and providing healthy foods. She testified as to several instances in which J.T. was endangered while in Timm's care, and she stated that Timm failed to show any appreciation for the dangerousness of the situation. She stated *513 that Timm left the front door open, allowing J.T. to leave the home, and that she let him play unsupervised in an area close to the road. She stated that Timm became angry with others for offering advice. Further, although Timm learned from past experience, she had no ability to foresee problems. Finally, Ebert testified that even after working with Timm for an extended period of time, she still had concerns for J.T.'s safety while in Timm's care.
Jerome Kelly, a homemaker who worked with Timm for over a year, also detailed several incidents in which Timm failed to appreciate a situation that was dangerous for J.T. In particular, he noted a low window which several people repeatedly told Timm was a danger to J.T. when open. He also noted instances when J.T. was playing near roofing nails and a hot grill, when Timm was sleeping while two-year-old J.T. was awake and opening the door for people, and when Timm and J.T. were feeding geese in the middle of the road. In each of these cases, Timm seemed to lack any understanding of the possible danger to children from these activities. His assessment of Timm was that even after a good deal of assistance, she made little progress in general, and no progress understanding the nutritional needs of children.
Likewise, Carol Hagerman, the OFC case manager, testified that she saw no progress in Timm's ability to understand safety, child development, or nutrition issues. She stated that Timm could not react to safety issues, nor could she carry out someone else's plan to provide a safe environment. She testified that the reasons for J.T.'s removal had not been remedied and that returning him to Timm's care posed a threat to his well-being.
Jim Burns, a therapist, stated that his concern for J.T.'s safety never went away during his years of service to Timm. He cited instances of J.T. putting objects in his mouth and having access to dangerous tools. He stated that Timm lacks the ability to see danger. He opined that Timm does not understand J.T.'s needs and that J.T. will not be safe in Timm's care.
Susan Anderson, a social worker involved with the family, testified that after visitation with Timm, J.T. would have night terrors. He would refuse to sleep in his own room and could not sleep through the night. He became aggressive and withdrawn and regressed in his toilet training. At one point, she recommended stopping visitation because of these adverse effects. She stated that throughout the time she worked with the family, Timm made no progress in learning to be vigilant of J.T.'s health and safety. She stated that Timm could alter her behavior in response to specific, repeated requests, but could not generalize to provide appropriate supervision for his health and safety. Finally, she stated that Timm lacked the capacity to understand on a daily basis how to intervene to keep J.T. safe.
Deborah Williams, the court-appointed special advocate, also witnessed situations in which J.T. was neglected and endangered while in Timm's care. She testified to several incidents, including visiting one day and finding J.T. dirty, with matted hair and a heavily soiled diaper.
There was also evidence that the situation was not likely to improve. Dr. Clifton Titus, a clinical psychologist, testified that there was no reason that someone with Timm's I.Q. could not be an effective parent; however, Timm's psychological make-up interfered with her parenting. He stated that his examination of Timm showed that she was impatient, impulsive, had a low frustration tolerance, immature thought patterns, and was highly motivated by her feelings. He testified that she had difficulty perceiving a child's needs apart from her own, that she had problems with consistency and following through, and that she became bored with day-to-day life. Finally, he testified that Timm's prognosis was poor because she did not *514 believe she had any problems, therefore, she would not try to benefit from any help.
David Johnson, another social worker involved with Timm, concurred. He stated that he did not believe that Timm could provide a safe environment for J.T. for any length of time on her own and that she was unable to make differentiation between her best interests and those of a child. He opined that this was part of her personality and not changeable. He also testified that in spite of making some improvements in providing stable housing and steady employment, near the end of their relationship, Timm had fallen into her former lifestyle of moving frequently, working part-time jobs, and falling out of contact.
The evidence supports the trial court's conclusion that the conditions resulting in J.T.'s removal would not be remedied and that continuation of the parent-child relationship posed a danger to J.T.
Timm also argues that her "parental rights should not have been terminated because she had an I.Q. of 79 and suffered from adult attention deficit disorder." Appellant's brief at 18. We find no evidence in the Record that supports this interpretation. Timm's parental rights were terminated not because of her level of intelligence, but because of her persistent inability to provide J.T.'s care and ensure his safety. While the court's order does detail Timm's impaired psychological functioning, it also states that in spite of an extensive list of services provided to Timm, and the general perception of those service providers that Timm was sincere in her desire to improve, Timm showed very little sustained improvement and a marked inconsistency in meeting J.T.'s needs. Further, the trial court did not base any part of its decision on Timm's intellectual function alone; rather, it used this factor as an explanation for why Timm, in spite of the assistance rendered to her, was unable to understand supervision and safety issues and translate general concepts into practice. The court cited numerous examples of situations in which J.T.'s well-being was compromised and put in jeopardy by Timm's failure to appreciate safety risks. Finally, the trial court set out certain aspects of her neurological dysfunction to illustrate that Timm's inability to get along with others prevented her from forming meaningful relationships and that her impatience and low frustration level negatively impacts her ability to parent effectively.
Finally, Timm argues that the trial court erroneously terminated Tawney's parental rights voluntarily prior to the trial on the termination of her parental rights. She contends that this decision was erroneous because had the trial court decided in her favor, she should have had the right to receive child support from Tawney. Because we have affirmed the trial court's decision, this issue is moot in this case.
However, we agree that Timm's concern is legitimate. Accordingly, we caution trial courts to be wary of voluntarily terminating the parental rights of a non-custodial parent before adjudicating the parental rights of the custodial parent. Doing so could materially affect the rights of the child to receive support in the event the custodial parent's rights are not terminated. Nonetheless, in spite of Timm's protestations to the contrary, we note that the trial court did not terminate Tawney's parental rights prior to adjudication hers. Rather, it correctly held the matter under advisement pending the resolution of Timm's case. Accordingly, the trial court did not err.
Affirmed.[1]
NAJAM, J., and VAIDIK, J., concur.
NOTES
[1] We hereby deny Appellant's request for oral argument, finding the issues presented adequately addressed in the briefs.