**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 13 2013, 8:22 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT
MOTHER:

**T. DEAN SWIHART**
Fort Wayne, Indiana


ATTORNEY FOR APPELLANT
FATHER:

**ROBERT H. BELLINGER**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**ALISA L. RUDE**
Indiana Dept of Child Services
Fort Wayne, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF<br>THE PARENT-CHILD RELATIONSHIP OF:<br>A.C., Minor Child,<br><br>K.W., Mother, and J.C., Father,<br><br>     Appellants-Respondents,<br><br>        vs.<br><br>INDIANA DEPARTMENT OF CHILD<br>SERVICES,<br><br>     Appellee-Petitioner. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 02A04-1206-JT-300<br>)<br>)<br>)<br>)<br>)<br>) |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable William L. Briggs, Senior Judge
Cause No. 02D08-1109-JT-156

**February 13, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

K.W. ("Mother") and J.C. ("Father") appeal the involuntary termination of their respective parental rights to their child, A.C. Concluding that there is sufficient evidence to support the trial court's judgment, we affirm.

**Facts and Procedural History**

Mother is the biological mother of four children, including A.C., born in July 2008. Father is the alleged biological father of A.C. only.[1] The evidence most favorable to the trial court's judgment reveals that in May 2010, the local Allen County office of the Indiana Department of Child Services ("ACDCS") received a report that Mother had taken A.C. from Father's home in Michigan for visitation purposes and was refusing to return the child to Father's care. The referral further indicated that two of Mother's three older children (A.C.'s half-siblings) were deceased and that Mother was facing pending Murder charges in the State of California related to the death of one of these children.

ACDCS initiated an assessment of the matter, located A.C. and Mother at the maternal grandmother's home in Fort Wayne, Indiana, and took A.C. into emergency protective custody based on Mother's admissions regarding the existence of a pending Murder charge in California[2] and concerns regarding Mother's ability to provide A.C. with a safe and stable home environment. During its assessment, ACDCS also learned

---

[1] Although Father does not dispute his parentage of A.C., it is unclear from the record whether paternity of A.C. had been legally established at the time of the termination hearing.

[2] The record discloses that prior to A.C.'s removal from Mother's care, Mother was arrested in California on Murder charges relating to the death of one of her children. She was later released from incarceration on her own recognizance. The California court did not impose any travel restrictions on Mother, and she later relocated to Michigan in April or May of 2010 with Father and A.C.

2

that in addition to Mother's two deceased children, Mother's third child had suffered severe physical injuries while in Mother's legal custody. Mother's third child was adopted by relatives.

Following A.C.'s removal from Mother's care, ACDCS filed a petition alleging A.C. was a child in need of services ("CHINS"). The trial court thereafter adjudicated A.C. a CHINS after Mother and Father admitted to a majority of the allegations contained in ACDCS's amended CHINS petition. Specifically, Mother admitted she: (1) had lived a "transient lifestyle in multiple states" with the alleged biological father of her older children and currently did not have independent housing; (2) had a prior criminal history including convictions for theft and fraud in the State of Florida for which she served one-and-one half years incarceration; and (3) was the victim of domestic violence having been "physically abused by [Father]" sometimes in the presence of A.C. State's Exhibit 11, p. 1-2.

Father's CHINS admissions included that he: (1) was unemployed and resided in Michigan in the home of his own mother; (2) used illegal substances in his past; (3) had witnessed Mother "become physically violent, having struck [Father] in the past;" (4) observed Mother "frequently yell at [A.C.] and become overly impatient with otherwise typical toddler behavior;" and (5) was involved in episodes of domestic violence that sometimes occurred in the presence of A.C. Id. at 2-3. The Amended CHINS order also alleged A.C. was a twenty-three-month-old toddler who "does not speak, suffers from significant anxiety, and is otherwise developmentally delayed." Id. at 2.

3

In June 2010, the trial court issued a dispositional order formally removing A.C. from Mother's and Father's custody and ordering that the child be made a ward of ACDCS. The court's dispositional order also incorporated a Parent Participation Plan ("PPP") which directed both parents to successfully complete a variety of tasks and services designed to address their respective parenting deficiencies and to facilitate reunification with A.C. Although the PPP was not included in the record on appeal by either Mother or Father, the language of the trial court's dispositional order specifically directed both parents to, among other things: refrain from all criminal activity; maintain clean, safe, and appropriate housing at all times; enroll in parenting classes; submit to psychological evaluations and follow all resulting recommendations; and participate in regular supervised visits with A.C.

Mother's and Father's participation in court-ordered services was varied, but ultimately unsuccessful in both cases. Mother, for example, achieved stable housing and employment. Mother also submitted to a psychological evaluation, but the results of her assessment were, in large part, not interpretable due to Mother's attempt to portray herself in an overly positive light through her test responses. In addition, although Mother regularly participated in individual counseling as recommended by ACDCS, she was unwilling to discuss her role in the circumstances surrounding the deaths and/or injuries to her three older children, as well as how these past events may serve to impact her future functioning and ability to safely parent A.C. Thus, notwithstanding Mother's participation in services, many caseworkers and service providers remained unconvinced that Mother could provide A.C. with a safe and stable home environment.

Father, on the other hand, failed to maintain stable housing throughout the underlying proceedings and bounced between living with friends and family. Father also never obtained stable employment and suffered with depression and other emotional difficulties throughout the underlying proceedings. In addition, Father continued to use alcohol and illegal substances.

After several unsuccessful attempts at placing A.C. with Father and relatives residing in Michigan through an Interstate Compact on the Placement of Children ("ICPC") agreement, ACDCS eventually filed a petition seeking the involuntary termination of Mother's and Father's parental rights in October 2011. A four-day evidentiary hearing on the termination petition was later held in February 2012.

During the termination hearing, ACDCS presented substantial evidence establishing that Mother and Father had failed to resolve their respective parenting issues and consequently remained incapable of providing A.C. with a safe and stable home environment. Moreover, many caseworkers and service providers testified that they believed continuation of the parent-child relationship between Mother and A.C. posed a threat to the child's well-being. As for the child, ACDCS presented evidence showing A.C. was improving and thriving in foster care.

At the conclusion of the termination hearing, the trial court took the matter under advisement. In May 2012, the court entered its judgment terminating Mother's and Father's parental rights to A.C. Both parents now appeal.

## Discussion and Decision

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. When, as here, the trial court makes specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied; see also Bester, 839 N.E.2d at 147. Thus, if the evidence and inferences support the trial court's decision, we must affirm. Id.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

>     (B)     that one (1) of the following is true:
>
>>          (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>>          (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>>          (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
>     (C)     that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).[3] The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)). "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added). Mother challenges the sufficiency of the evidence supporting the trial court's findings as to subsection (b)(2)(B) and (C) of the termination statute cited above. Father's sole allegation on appeal challenges the sufficiency of the evidence supporting the trial court's determination that termination of his parental rights is in A.C.'s best interests. We shall address each parent's arguments in turn.

---

[3] We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

7

## I. Threat to Well-Being

Indiana Code § 31-35-2-4(b)(2)(B) requires the State to establish, by clear and convincing evidence, only one of the three requirements of subsection (b)(2)(B). Because we find it to be dispositive, we limit our review to Mother's allegations of error pertaining to subsection (b)(2)(B)(ii) of Indiana's termination statute, namely, whether ACDCS presented clear and convincing evidence establishing that continuation of the parent-child relationship poses a threat to A.C.'s well-being.

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. The trial court may also consider any services offered to the parent by the county department of child services and the parent's response to those services, as evidence of whether conditions will be remedied. Id.

Here, the trial court made meticulous findings concerning Mother's history of criminal activities, deficient parenting, and participation in domestic violence in its fourteen-page termination order. In so doing, the trial court detailed Mother's prior

relationship with the alleged father of A.C.'s older siblings, acknowledging that two of A.C.'s siblings are now deceased and that their alleged father has been charged with their murder. The trial court went on to find that Mother was likewise facing pending murder charges in the State of California for the death of one of her children. In addition, the court specifically found:

> [I]t was revealed that after the death of one of the children, [Mother] and [the alleged father] kept the child's body in a container and she and [alleged father] traveled for quite some time with the child's body in the container. Neither [Mother] nor [the alleged father] reported the death of the second child to the authorities at the time of the child's death.

Joint Appendix of Appellants at 10. The court further noted that the couple's third child had also received "significant injuries" while in the home of Mother and the alleged father and that this child was later adopted by relatives at or near the same time Mother was incarcerated on theft and fraud convictions in Florida. Id. at 9.

As for Mother's past relationships and home environment for A.C., the trial court specifically found that both parents have "acknowledged that they would engage in verbal arguments and physical altercations and that on one occasion, [Mother's] nose got broken during a physical altercation." Id. The court went on to note that Mother and Father "acknowledge that [A.C.] was sometimes present during the fights," and that on another occasion Father was in the car with A.C. when Mother "threw a cinder block that broke the car window" and left glass "all over [Father] and [A.C.]." Id.

Regarding Mother's psychological evaluation, participation in individual counseling, and current ability to safely care for A.C., the trial court recognized in its findings that Mother had participated in a psychological evaluation performed by Dr.

9

James Cates in order to assess Mother's "needs." Id. at 11. The court pointed out, however, that Dr. Cates's felt "the validity of the results" of the Millon Clinical Multiaxial Inventory-III, which evaluates personality functioning and dysfunction, "was in question because [Mother] tried to portray herself in an overly positive light." Id. Dr. Cates further reported that during the evaluation, Mother's responses were "defensive" and that the Child Abuse Potential Inventory-Form VI test results indicated that Mother's responses "tried to create an unrealistically favorable impression, suggesting that the test results were invalid and largely uninterpretable [sic]." Id.

Although Dr. Cates reported that he had advised Mother not to share any information with him that may incriminate Mother in her pending murder proceedings, the court's findings reflect Dr. Cates' testimony that he remained concerned that "without some of the information that could be shared if the criminal charges were not pending, he could not confirm what [Mother's] role was in the deaths of her children or the injuries to her third child." Id. at 12. The court further found:

> [Dr. Cates] specifically noted that based upon his evaluation of the mother, she appeared to be re-writing history. He noted that there were major discrepancies in what she was describing to him and specifically noted that he was concerned about her ability to protect herself and others. . . . [Dr. Cates] also noted that he did not believe that therapy would be helpful until the criminal charges were disposed of. He felt that it would be important to truly understand the mother's role in the deaths of two (2) of her children and the injury of a third child. He also felt that it would be important to know how the mother has coped with what has happened. When advised that the mother's current therapist, who is not a psychologist and not a member of the American Psychological Association, only addressed incidents that occurred in the mother's past approximately thirty (30%) of the time over the course of her eight (8) months of therapy, he noted that the [ACDCS] would be unable to assess whether the mother could ensure her own safety or ensure the safety of those around her.

10

Id. Based on these and other findings, the trial court concluded:

The Court finds and concludes that although the mother has participated in many of the services provided by the [ACDCS], she has not benefitted from services to the point where the court can conclude that she no longer poses a danger to the well[-]being and safety of her child. Unfortunately, during her counseling sessions, there was little emphasis in uncovering the mother's role in the deaths of two of her children and the significant injuries to a third child while in her home and little discussion regarding how she has coped with the deaths and injuries or about incidents that occurred in the mother's past which could have an impact on her psychological functioning. In fact, it is highly likely that the events occurring in her past have had a significant impact on her functioning and on the events surrounding the deaths of two of her children and the injuries sustained by the third child. In his evaluation, Dr. Cates indicated that the mother appeared to be re-writing her history to completely deny or ignore that certain tragic events have occurred. This is borne out by the fact that although the mother acknowledged that her stepfather molested her when she was a child, at the hearing on the Petition for Termination of the Parent-Child Relationship, she testified that if the child were returned to her care, her stepfather would be the person who would care for the child while she is at work. This theory is also supported by the fact that although the mother initially informed the [ACDCS] case managers that she had been physically abused by her mother when she was a child, she later denied that the events occurred and further denied even making the statements when she was evaluated by Dr. Cates. [Mother] is presently living in the home of her mother and stepfather and would be relying on them to assist her in the care of [A.C.] if [the child] were returned to her home. This propensity to deny and/or minimize events occurring in her past and her inability to fully address these issues in counseling prevents her from truly addressing her psychological issues and causes great concern for the safety and well[-]being of any child who would be in her care.

Id. at 7. A thorough review of the record reveals that clear and convincing evidence supports the trial court's findings and conclusions detailed above.

During the termination hearing, Dr. Cates confirmed that Mother "tried to present herself in an excessively favorable light" during portions of the psychological evaluation and at other times "responded in a defensive manner." Transcript at 260, 262. Dr. Cates also testified that testing revealed Mother's Post Traumatic Stress Profile was "elevated"

11

and that post-traumatic stress is a "crippling anxiety" which impacts an individual's "coping skills" and ability to "remain adaptive." Id. at 262. Dr. Cates went on to acknowledge that post-traumatic stress could potentially "impact a parent's ability to provide protection for a child." Id.

When asked if he had "any concern[s]" regarding Mother in light of her presence in the lives of her older children when they died, Dr. Cates answered in the affirmative and explained that although it was his "ethical responsibility" to advise Mother not to share information that could be incriminating in her pending criminal case, he nevertheless was "concerned about what her role was." Id. at 270-271. Dr. Cates further testified that there were "glaring discrepancies" in the way Mother had described her history to other people in the past and the way she had described her history to him, stating that he believed Mother was "rewriting her history, consciously or unconsciously," which left him "concerned about [Mother's] ability to effectively protect herself, much less anyone else, under those circumstances." Id. at 271. Finally, Dr. Cates informed the trial court that until Mother was able to "have true confidentiality" with a therapist so she could "genuinely open up" about what had happened in her past, he did not believe that Mother's "therapy was truly going to be helpful." Id. at 272.

In recommending termination of Mother's parental rights, ACDCS case manager Mary Lane likewise testified that she remained concerned about A.C.'s well-being should the child be allowed to return to Mother's care. Although Lane acknowledged that Mother completed most of the reunification services initially ordered by the trial court, Lane pointed out that Mother had refused to submit to ACDCS's request for a second

12

psychological evaluation. Lane informed the trial court that the second referral had been made due to conflicting reports by Mother's therapist, Helen Ferguson, who did not share Dr. Cates' concerns regarding Mother's ability to progress in therapy and to safely care for A.C. In addition, Lane confirmed that Mother had failed to complete individual counseling by the time of the termination hearing and that ACDCS remained concerned about Mother's pending murder charges as follows:

> At this point, the pending murder charge is a concern. . . . [Mother] has indicated that she was not present during the deaths of her children. However, we are not sure. [Mother] [h]asn't really indicated what responsibility or what level of responsibility she had in that . . . [and] . . . [a]t this point, she hasn't completed her treatment. She hasn't completed therapy.

Id. at 337.

When asked whether she agreed with therapist Ferguson about Mother's abilities to provide care for A.C., Lane answered in the negative stating:

> I believe until . . . we know exactly what [Mother's] role was with the other children, whether she was personally involved, or if she didn't physically harm the children, how she continued to allow this man to be a caregiver[,] I don't know how we can ensure that she wouldn't allow the same with A.C.

Id. at 353. When pressed during cross-examination as to why she believed knowing the extent of Mother's involvement in the deaths and injuries to her three older children was so important in light of the fact that their alleged father had reportedly "taken full responsibility for the deaths of the two children," Lane explained that it was troubling that Mother had reported being "shocked" each time after all three children had been killed or seriously injured by their alleged father. Id. at 354, 357. Lane further testified that in light of this response by Mother, ACDCS remained concerned regarding Mother's

13

ability to protect A.C. in the future. Lane also emphasized that there continued to be unanswered questions as to why Mother had allowed the alleged father "to continue to be a caregiver after a first death, and a second death[,] and he was again a caregiver a third time." Id. at 357.

As noted above, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's *habitual patterns of conduct* to determine the probability of future neglect or deprivation of the child. In re D.D., 804 N.E.2d 258, 266 (Ind. Ct. App. 2004), trans. denied. A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, emotional, and social growth is permanently impaired before terminating the parent-child relationship. In re E.S., 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). After reviewing the record in its entirety, we conclude that clear and convincing evidence supports the trial court's specific findings set forth above. These findings, in turn, provide ample support for the court's ultimate decision to terminate Mother's parental rights to A.C. Mother's arguments to the contrary, emphasizing her self-serving testimony, rather than the evidence relied upon by the trial court, amount to an impermissible invitation to reweigh the evidence. See D.D., 804 N.E.2d at 265. Finally, Mother's complaint that the trial court improperly relied upon her refusal to participate in a second psychological evaluation because the evaluation was merely requested by ACDCS and not specifically ordered by the trial court is unavailing. Even assuming, *arguendo*, that the trial court made an improper finding in this regard, in light of the numerous other specific findings supporting the trial court's determination that

14

continuation of the parent-child relationship poses a threat to A.C.'s well-being, any erroneous finding regarding the request for a second psychological evaluation in this regard is harmless error. See In re M.M., 733 N.E.2d 6, 14 (Ind. Ct. App. 2000) (stating that in light of factually accurate findings supporting the termination, any erroneous findings are harmless).

## II. Best Interests

We next consider both Mother's and Father's assertions that ACDCS failed to prove termination of their respective parental rights is in A.C.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. Id. Moreover, we have previously held that the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. M.M., 733 N.E.2d at 13.

In addition to the findings previously cited, the trial court made several additional pertinent findings relating to A.C.'s best interests. Specifically, the court found that both parents had shown over the course of the CHINS case, and in "numerous specific services made available and/or provided, that said parent(s) continue(s) to be unable, refuse, or neglect to provide for the basic necessities of a suitable home for the raising of [A.C.]." Joint Appellant's Appendix at 16. The court went on to find that the

15

relationship between Mother and Father had been a "dangerous and destructive relationship" that was "verbally and physically abusive" to such a degree that A.C. "apparently became so accustomed to the chaos and violence in his home environment that on the day of his removal, he fell asleep in the case manager's arms even though there was a lot of chaos, yelling, screaming[,] and crying going on because of the removal." Id. In addition, at the time of A.C.'s removal from the family home, the nearly two-year-old child "was not very verbal," did not "interact well with other children" in the foster home, would "engage in temper tantrums where he would bite or kick others, scratch himself, throw himself against a wall[,] or slam himself into the back of his high chair." Id.

The court also took note of Mother's history of involvement in "dangerous and destructive" relationships, finding that Mother chose to stay in a relationship with the alleged father of her older children, even after "each tragic" death or injury occurred and that she later entered into a relationship with Father, which was also "a volatile relationship." Id. at 19. The court went on to find that "[t]his pattern of domestic violence appeared to have an impact on [A.C.'s] emotional functioning and development." Id. In addition, the court acknowledged Dr. Cates testimony concerning what appears to be Mother's "re-writing" of her history and further finding that her "propensity to deny and/or minimize" the events occurring in her past, her "dependent personality traits," and the "inability to fully address these issues in counseling prevents her from truly addressing her psychological issues and causes great concern for the safety and well[-]being of any child who would be in her care." Id.

16

As for Father, the trial court found that although ACDCS's referrals for Father were "designed to assist him in caring for [A.C.] and in providing for the necessities of a suitable home for the raising of the child," Father had "failed to participate." Id. The court further noted that during the underlying proceedings, Father never achieved stable housing and had lived "in at least 6 different locations," including living in a tent in the woods on a friend's property. Id. The court also found that Father had participated in the use of alcohol and marijuana "from time to time" during the underlying proceedings, but had declined to participate in counseling or any other service designed to assist him in refraining from consumption of these substances. Id. at 20. Finally, the trial court noted Father's own testimony during the termination hearing that he was currently "experiencing emotional difficulties," "cried all the time," had contemplated suicide, did not currently have stable housing, was unemployed, and could not "provide a home or financially care for [A.C.] at that time." Id. Based on these and other findings, the trial court concluded that termination of both Mother's and Father's parental rights was in A.C.'s best interests. These findings and conclusions, too, are supported by the evidence.

In recommending termination of Mother's and Father's respective parental rights, the Guardian Ad Litem ("GAL") Susan Rutz informed the trial court that in light of significant testimony concerning Father's past and current housing and employment stability, in addition to newly alleged "inappropriate behavior" with his sister, she believed that Father was "not in a position to take care of himself right now, let alone take care of [A.C.]." Id. at 399. As for Mother, GAL Rutz testified that she remains "disturbed" by Mother's "lack of truly . . . understanding her role in the deaths of the two

17

children, the injuries to the third[,] and the reasons for the removal of A.C." Id. at 399-400. Rutz further testified that she questions the "effectiveness" of Mother's counseling to date and does not believe that Mother is "in a position at this point in time to protect A.C." Id. at 401-402. Similarly, in recommending termination of Mother's and Father's parental rights as in A.C.'s best interests, case manager Lane informed the trial court that A.C. was "doing really well" in his current foster home. Id. at 338. Lane also informed the trial court that A.C. needs "stability" in a "home free from abuse and neglect." Id. Finally, Lane testified, "A.C.'s been in foster care for approximately two years at this point. [ACDCS] doesn't feel that either parent is in a position to parent him at this time[,] and A.C. needs permanency." Id. at 361.

Based on the totality of the evidence, including Mother's and Father's unresolved parenting issues and failure to complete and/or benefit from court-ordered reunification services throughout the underlying proceedings, coupled with the testimony from case manager Lane and GAL Rutz recommending termination of the parent-child relationships, we conclude that there is clear and convincing evidence to support the trial court's determination that termination of both Mother's and Father's parental rights is in A.C.'s best interests.

This court will reverse a termination of parental rights "'only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made.'" Matter of A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

BAILEY, J., and VAIDIK, J., concur.