**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Oct 05 2012, 8:38 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:
**STEVE FAWCETT**
Law Offices of Elden E. Stoops, Jr., P.C.
North Manchester, Indiana

ATTORNEYS FOR APPELLEE:
**TODD A. WHITEHURST**
Indiana Department of Child Services
Wabash, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: T.O., S.O., B.O., R.O., Z.O., E.O., & G.O. (MINOR CHILDREN), AND J.C. (MOTHER), | ) ) ) ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 85A05-1204-JT-170 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE WABASH CIRCUIT COURT
The Honorable Robert R. McCallen III, Judge
Cause Nos. 85C01-1109-JT-18, 19, 20, 21, 22, 23 & 24

**October 5, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

J.C. ("Mother") appeals an order terminating her parental rights to T.O., S.O., B.O., R.O., Z.O., E.O., and G.O. (collectively, "the Children") upon the petition of the Wabash County Department of Child Services ("DCS").[1] We affirm.

**Issue**

Mother presents a single issue for appeal: Whether DCS established, by clear and convincing evidence, the requisite statutory elements to support the termination of parental rights.

**Facts and Procedural History**

On March 22, 2010, DCS investigated a report that Mother, the Children, and their stepfather were living in a motel after B.O. started a fire that damaged the family residence. Caseworkers discovered that the stepfather had struck G.O. with a broom, Mother had intervened and struck the stepfather with the broom, and G.O. was in need of medical attention.[2] DCS removed the Children from Mother's care and filed a petition alleging that the Children were Children in Need of Services ("CHINS").

On March 24, 2010, the juvenile court conducted an initial hearing at which Mother denied the allegations. On May 5, 2010, a fact-finding hearing was conducted. The Children were determined to be CHINS and the out-of-home placement continued.

Mother participated in services directed toward reunification. She regularly visited

---

[1] Mother's ex-husband, who is the father of all seven children, is not an active participant in this appeal.

[2] Then three-year-old G.O. had large welts on his right shoulder blade and lower back, scrapes and abrasions on his right side, and an open and bleeding wound on his head. (DCS App. 12-15.)

2

the Children and was "substantially compliant" with home-based services provided by White's Family Services. (App. 38.) However, her participation in individual therapy at the Bowen Center was inconsistent.

On July 28, 2011, the Children were returned to Mother's care on a temporary trial basis. The family was provided with ten to twenty hours of family preservation services weekly. During the trial home visit, law enforcement officers were called to Mother's home on multiple occasions; S.O. ran away from home; S.O. threw rocks at a service provider's vehicle and was placed in a juvenile facility; Mother pushed Z.O. against the wall; Z.O. tried to jump out of an upstairs window; and a home-based service provider observed Mother strike B.O., S.O., and Z.O. On August 30, 2011, the children were again removed from Mother's care.

After the second removal, Mother appeared for supervised visits with the Children, but the visits were "very rocky" as there was "a lot of swearing" and Mother threatened some of the Children. (Tr. 12.) Visits were reduced from twice weekly to once weekly. Historically, the children had significant behavioral issues and displays of aggression. Some were violent toward their siblings and foster family members. As a whole, the Children had regressed while in the trial in-home visit, but had "flourished" in subsequent foster placements.[3] (Tr. 25, 198.)

On September 2, 2011, DCS petitioned to terminate Mother's parental rights. The

---

[3] Foster parents testified that when the Children were first placed, they did not know how to use silverware, "licked bowls like animals," shoveled in food as if they were starving, lacked skills to bathe themselves, profusely used profanity, and behaved wildly and aggressively. (Tr. 241, 254.)

Wabash County Circuit Court, Juvenile Division, conducted an evidentiary hearing on February 28, February 29, and March 1, 2012. On March 5, 2012, the court issued an order terminating Mother's parental rights. She now appeals.

**Discussion and Decision**

A. Standard of Review

Our standard of review is highly deferential in cases concerning the termination of parental rights. In re K.S., 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). This Court will not set aside the trial court's judgment terminating a parent-child relationship unless it is clearly erroneous. In re A.A.C., 682 N.E.2d 542, 544 (Ind. Ct. App. 1997). When reviewing the sufficiency of the evidence to support a judgment of involuntary termination of a parent-child relationship, we neither reweigh the evidence nor judge the credibility of the witnesses. Id. We consider only the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. Id.

B. Requirements for Involuntary Termination of Parental Rights

Parental rights are of a constitutional dimension, but the law provides for the termination of those rights when the parents are unable or unwilling to meet their parental responsibilities. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents, but to protect their children. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Indiana Code Section 31-35-2-4(b)(2) sets out the elements that DCS must allege and prove by clear and convincing evidence in order to terminate a parent-child relationship:

4

(A) That one (1) of the following is true:

    (i)      The child has been removed from the parent for at least six (6) months under a dispositional decree.

    (ii)     A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

    (iii)    The child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) That one (1) of the following is true:

    (i)      There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

If the court finds that the allegations in a petition described above are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). A trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of

5

future neglect or deprivation of the child." Id.

C. Analysis

Mother asserts that, although "the trial in-home visit did not go well," this "does not erase the progress she made to that point remedying the factors that led to the children's removal or diminish the reasonable probability of Mother ultimately remedying those factors." Appellant's Brief at 10. Mother does not challenge the juvenile court's determination pursuant to Indiana Code Section 31-35-2-4(b)(2)(A) (removal from parent), (C) (best interests of the children) or (D) (satisfactory plan). She challenges the determination relating to Indiana Code Section 31-35-2-4(b)(2)(B) (conditions will not be remedied or relationship poses a threat to child's well-being).

Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, and therefore the court needed to find that only one of the three requirements of subsection (b)(2)(B) had been established by clear and convincing evidence. See L.S., 717 N.E.2d at 209. Because we find it to be dispositive under the facts of this case, we consider only whether DCS established, by clear and convincing evidence, that there is a reasonable probability that the conditions resulting in the removal or reasons for placement outside the home will not be remedied. See Ind. Code § 31-35-2-4(b)(2)(B)(i). The relevant statute does not simply focus on the initial basis for removal for purpose of determining whether a parent's rights should be terminated, "but also those bases resulting in the continued placement outside the home." In re A.I., 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), trans. denied.

Initially, the Children were removed because Mother failed to provide a safe and

6

stable environment for them. Mother has since separated from her then-husband who spanked several of the Children and injured B.O. However, removal of the stepfather from the family dynamic did not protect the Children from the threat of physical abuse.

DCS presented evidence that, when they were informed of the impending in-home trial visit with Mother, "all [of the Children] reacted negatively and several of them said no." (Tr. 90, Ex. 8.) R.O. stated, "No, I don't want to come home. Mom is mean and she pulls my shirt and hits us." (Tr. 90.) Two of the Children refused to leave the van until they were physically removed.[4] When some of the former foster parents visited, Z.O. reported that Mother had been beating him in the stomach. (Tr. 243.) B.O. reported that Mother had slammed his head into a door. (Tr. 243.) When Mother was confronted by B.O. in the foster parent's presence, Mother responded, "you're darn right I beat [you], and that goes for all of you." (Tr. 243.)

Mother was ordered to participate in individual counseling but her participation was sporadic; she stopped attending sessions for several months. Mother expressed an unwillingness "to rehash her issues." (Tr. 102.) Also, Mother appeared resistant to professional recommendations and unable to implement new parenting techniques. She reported to one of her therapists that she felt overwhelmed and she expressed a belief that she could not adequately discipline her six sons and one daughter without resorting to methods disapproved of by DCS as "harsh or abusive." (Tr. 201.)

---

[4] Mother did not assist the Children into her house until she was prompted to do so. Both Mother and the Children appeared detached. One of the Children continued to insist that his foster mother was his mother and he belonged in her home. Additionally, caseworkers discovered that Mother had failed to bring groceries into the house in anticipation of the Children's return.

Although Mother was provided with intensive in-home services, she continued to discipline the Children inappropriately and to threaten them. For example, she threatened to cut off some of the Children's fingers for misbehavior. A home-based service provider saw Mother strike B.O., S.O., and Z.O. multiple times on August 29, 2011. Post-removal visitation was difficult, as Mother continued to verbally threaten the Children. They sometimes recoiled when Mother came near them, as if they were expecting to be struck.

In seeking reversal of the termination decision, Mother directs our attention to the testimony of the Court Appointed Special Advocate ("CASA"). The CASA opined that DCS had returned the Children too early to expect a successful reunification and further testified that she had "made my decision that I was not for the TPR." (Tr. 277.) Curiously, the CASA also agreed with DCS that termination was in the Children's best interests; however, she continued to opine that the termination petition should not be granted. In essence, Mother asks that we reweigh the evidence and accord greater weight to the CASA's recommendation. We will not do so. See In re A.A.C., 682 N.E.2d at 544.

DCS presented clear and convincing evidence from which the trial court could conclude that there was a reasonable probability that the conditions resulting in the removal or reasons for placement outside the home would not be remedied.

## Conclusion

DCS established by clear and convincing evidence the requisite elements to support the termination of parental rights.

Affirmed.

8

RILEY, J., and CRONE, J., concur.