**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Feb 26 2013, 8:53 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:
**R. PATRICK MAGRATH**
Alcorn Goering & Sage, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE:
**KRISTEE L. BRUCE**
DCS, Jackson County Local Office
Seymour, Indiana

**MARJORIE A. MILLMAN**
DCS, Jackson County Local Office
Shelbyville, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE TERMINATION OF THE | ) | |
| PARENT-CHILD RELATIONSHIP OF: B.H., | ) | |
| (MINOR CHILD) AND K.H.L. (MOTHER) | ) | |
|     Appellant-Respondent, | ) | |
| | ) | |
|         vs. | ) | No.  36A01-1209-JT-416 |
| | ) | |
| INDIANA DEPARTMENT OF CHILD | ) | |
| SERVICES, | ) | |
|     Appellee-Petitioner. | ) | |

APPEAL FROM THE JACKSON SUPERIOR COURT
The Honorable Bruce A. MacTavish, Judge
Cause No. 36D02-1205-JT-34

**February 26, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

## Case Summary

K.H.-L. ("Mother") appeals the termination of her parental rights as to B.H. ("Child"). While she purportedly raises several issues on appeal, we consolidate and restate her issue as: whether there was sufficient evidence to support the termination court's order. We affirm.

## Facts and Procedural History

Child was born to Mother and T.T. ("Father") (collectively "Parents") on May 13, 2010. On the evening of June 17, 2010, police responded to a domestic disturbance complaint involving Mother and her boyfriend, who is not Child's father. When the police arrived, Mother's boyfriend had already left the area, and Mother was a significant distance from the apartment complex. The police found the front door of Mother's apartment open, with Child buckled into a car seat on the floor near the door. The police reported the situation to the Indiana Department of Child Services ("DCS"). On the morning of June 18, 2010, Dan Thomas ("Thomas"), a DCS Family Case Manager ("FCM"), went to Mother's apartment to investigate the police report. Mother became agitated and left with Child, who was in the car seat. Thomas called the police and Child's maternal grandmother, who eventually convinced Mother to go to the maternal grandmother's house with Child. Thomas detained Child due to the police report and his observations of Mother's erratic, abnormal behavior.

A Child in Need of Services ("CHINS") petition was filed on June 21, 2010, and Child was removed from Mother's care and placed in foster care based on the incidents of

June 17 and 18, 2010, and Mother's "inability to provide shelter, care, and/or supervision" for Child. (DCS Ex. 3-D.) At a disposition hearing on July 21, 2010, Mother admitted that Child was a CHINS, and the termination court ordered, in part, that Mother: maintain all medical appointments for Child; attend and participate in visitation with Child; allow DCS to conduct announced and unannounced visits to her home; provide a safe, clean, stable, and violence-free home for Child; participate in home-based case management with Peggy Hood ("Hood") from DCS to improve parenting skills; and participate in domestic violence counseling. The CHINS permanency plan was stated as a permanent return home, until a June 6, 2012 termination court order changed the permanency plan to termination of parental rights and adoption.

On May 11, 2012, DCS filed a petition to terminate Parents' rights as to Child. On August 8, 2012, the termination court conducted an evidentiary hearing, and on the same day Father filed a form to voluntarily relinquish his parental rights as to Child. On August 30, 2012, the termination court issued its Order terminating Parents' rights as to Child.

Mother now appeals.

**Discussion and Decision**

The termination court made specific findings of fact and conclusions thereon, therefore we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. Id. We will not set aside the termination court's judgment terminating a parent-child

relationship unless it is clearly erroneous. Id. A judgment is clearly erroneous if the findings do not support the termination court's conclusions, or the conclusions do not support the judgment. Id.

Our standard of review is highly deferential in cases concerning the termination of parental rights. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1250 (Ind. Ct. App. 2002), trans. denied. When reviewing the sufficiency of the evidence to support a judgment of involuntary termination of a parent-child relationship, we neither reweigh the evidence nor judge the credibility of the witnesses. In re A.A.C., 682 N.E.2d 542, 544 (Ind. Ct. App. 1997). We consider only the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. Bester, 839 N.E.2d at 147.

*Requirements for Involuntary Termination of Parental Rights*

Parental rights are of a constitutional dimension, but the law provides for the termination of those rights when the parents are unable or unwilling to meet their parental responsibilities. See id. The purpose of terminating parental rights is not to punish the parents, but to protect their children. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Indiana Code section 31-35-2-4(b)(2) sets out the elements that DCS must allege and prove by clear and convincing evidence in order to terminate a parent-child relationship:

(A) that one (1) of the following is true:

    (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.

    (ii)    A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are

4

not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

If the court finds that the allegations in a petition described above are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a). A termination court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The termination court also must "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. A court need not wait until a child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating a

5

parent-child relationship. Id.

Mother challenges the termination of her parental rights, arguing that DCS failed to establish, by clear and convincing evidence, that under section 31-35-2-4(b)(2)(B)(i) there was a reasonable probability that the conditions that led to the removal would not be remedied. Section 31-35-2-4(b)(2)(B) is written in the disjunctive, and therefore the termination court needed to find and conclude only that one of the three requirements of section 31-35-2-4(b)(2)(B) had been established by clear and convincing evidence. See L.S., 717 N.E.2d at 209.

Here, the termination court entered findings under both sub-sections (B)(i) (reasonable probability conditions will not be remedied) and (B)(ii) (reasonable probability of threat to well-being of Child). (App. at 50-51.) Because Mother challenges only the termination court's determination relating to sub-section (B)(i) (reasonable probability conditions will not be remedied), not sub-section (B)(ii) (reasonable probability of threat to well-being of Child), she effectively waives her argument challenging the termination court's determination pursuant to section 31-35-2-4(b)(2). See Ind. Appellate Rule 46(A)(8)(a).

Moreover, we disagree with Mother's assertion that DCS failed to establish, by clear and convincing evidence, that there was a reasonable probability that the conditions that led to the removal would not be remedied.

Here, the evidence most favorable to the judgment discloses a substantial probability of future neglect or deprivation of Child. See J.T., 742 N.E.2d at 512. As of the time of the

6

termination hearing, Mother had no income, and had not been able to keep a job for some time. (Tr. at 79.) She had moved several times since June of 2010, and had been homeless twice during that period. (Tr. at 26-29.) At the time of the termination hearing, Mother lived in a camper on her in-laws' property with no running water or plumbing. (Tr. at 29.) She was to be evicted from the camper one week after the termination hearing, and had no plan for alternative housing. (Tr. at 162.)

Hood testified that Mother has trouble interacting with Child. (Tr. at 47.) Serenity Phillips ("Phillips"), a court appointed special advocate, testified that Mother doesn't pay much attention to Child during visits, and Mother prefers to speak with the other adults in the room. (Tr. at 78.) Child is not excited to see Mother during visits, and seeks comfort and attention from the caseworkers, instead of from Mother. (Tr. at 51.) Mother exhibits behavior towards Child inappropriate for his young age, and is insensitive to Child's developmental stage. (Tr. at 49-50.) For example, Mother encourages Child to hit, bite, punch, and beat others. (Tr. at 50.) Patricia Carnahan, a licensed foster parent who took care of Child during a substantial portion of the proceedings, testified that Child had been a "pretty good little boy" at the beginning of foster care, but as he grew and participated in more visits with Mother, he became more aggressive and angry, and eventually he would hit and bite, thinking it was funny. (Tr. at 68-73.)

Mother has a learning disability and mental health issues, including a personality disorder. (Tr. at 145-46, 168-69). She has anger and impulse control issues, and has been arrested twice since June of 2010 for issues involving domestic disputes. (Tr. at 156, 167.)

7

One of those arrests resulted in a misdemeanor conviction for Disorderly Conduct. (Tr. at 156-57.)

Hood testified that Mother has difficulty multitasking, and thus cannot effectively monitor Child while doing other things. (Tr. at 57-58.) This has resulted in Child engaging in potentially dangerous behavior around the house while Mother was preoccupied with another task. For example, caseworkers observed Child at various times chewing on a flip-flop, placing a razor blade in his mouth, standing on a baseboard heater while the heater was on, pushing on an upstairs window screen, and placing a cigarette in his mouth. (Tr. at 42-43.) Phillips testified that she hasn't noticed any changes in Mother's parenting skills since the beginning of her involvement with the case. (Tr. at 79.)

Child has several medical conditions, including asthma, eczema, and a milk allergy, all of which require special care. (Tr. at 76-77.) Phillips testified that Mother does not bathe Child as necessary to prevent eczema outbreaks, and dislikes reading the ingredients on food items to ensure Child's milk allergy does not become an issue. (Tr. at 77.) Mother attended only one of Child's four previous dermatologist appointments, even though Linda Griffin, a DCS FCM, offered to take Mother and Child to those appointments. (Tr. at 21.) Child is a "picky eater," and requires carefully-monitored feeding; Mother became frustrated with the level of care required to feed Child, and would either prematurely end feeding or feed Child too much at once, causing him to vomit. (Tr. at 44-45.) At various times, Mother did not use or obtain medicine that had been prescribed for Child. (Tr. at 21.)

There was sufficient evidence upon which the termination court could conclude there

8

was a reasonable probability that the conditions that led to the removal would not be remedied.

## Conclusion

DCS established by clear and convincing evidence the requisite elements to support the termination of Mother's parental rights.

Affirmed.

VAIDIK, J., and BROWN, J., concur.