Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT:

**L. MATTHEW NIXON**
Fair, Nixon & Nixon, P.C.
Princeton, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**RAYMOND P. DUDLO**
DCS, Gibson County
Princeton, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: C.W. (Minor Child), and J.W. (Mother),     Appellant-Respondent, <br><br> vs. <br><br> THE INDIANA DEPARTMENT OF CHILD SERVICES,     Appellee-Petitioner. | )<br>)<br>)<br>)<br>)<br>)   No. 26A01-1303-JT-113<br>)<br>)<br>)<br>)<br>) |

APPEAL FROM THE GIBSON CIRCUIT COURT
The Honorable Jeffrey F. Meade, Judge
Cause No. 26C01-1205-JT-5

**October 10, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

## Case Summary

J.W. ("Mother") appeals the termination of her parental rights upon the petition of the Gibson County Department of Child Services ("the DCS"). We affirm.

## Issues

Mother presents three issues for appeal:

I.   Whether she was denied due process in the CHINS proceedings because a social worker discouraged her active participation in services;

II.  Whether she was denied due process in the termination proceedings because the substance of the trial court's order failed to comply with Indiana Code section 31-35-2-8(c); and

III. Whether the DCS established, by clear and convincing evidence, the requisite statutory elements to support the termination decision.

## Facts and Procedural History

On April 27, 2011, Mother gave birth to C.W. Two days after Mother and C.W. were discharged from the hospital, Mother brought C.W. to a medical appointment and reported her belief that C.W. was failing to urinate. The medical staff educated Mother in how to examine a diaper for urine, and then contacted home-based family services to follow-up and offer Mother parenting education.

When C.W. was twenty-eight days old, the DCS received a report that C.W. had missed medical appointments. On June 22, 2011, the DCS and Mother entered into an Informal Adjustment, a negotiated agreement whereby Mother agreed to participate in various services with the goal of maintaining C.W. in Mother's home. C.W. was hospitalized and diagnosed with failure to thrive. She also had "apneic episodes" where she would stop

breathing and her lips would turn blue. (Vol. 1, pg. 21.)[1] In the hospital, C.W. gained weight appropriately. On August 15, 2011, the DCS took custody of C.W. and she was placed in foster care.

The DCS filed a petition alleging that C.W. was a Child in Need of Services ("CHINS") because her parents were unable or unwilling to provide for her care. The Gibson County Circuit Court found C.W. to be a CHINS because Mother had cancelled medical appointments due to lack of gas money, C.W. had been diagnosed with failure to thrive, the hospital staff had discovered that Mother had been improperly mixing infant formula, medical appointments were missed even after the diagnosis, C.W. was re-admitted to the hospital with projectile vomiting and dehydration, C.W. was in the lowest percentile for weight and height for her age, C.W. had gained weight when hospitalized, Mother had allowed C.W. to sleep on her stomach despite apneic episodes, Mother had mixed gelatin with water for C.W., and Mother's lack of supervisory skills had endangered C.W.[2]

Mother was ordered to keep appointments with service providers, maintain suitable housing and appropriate food for C.W., complete a parenting assessment and a psychological evaluation, attend C.W.'s medical appointments, and engage in scheduled visitations. Mother cancelled many appointments, but attended many others. Despite the provision of services for eighteen months, Mother appeared unable to significantly improve her skills with

[1] Each hearing was transcribed in a separate volume, with pages beginning at one in each instance. Thus, we refer to both the volume number and page number in citing to the record.

[2] C.W.'s paternity has not been established. The DCS made efforts to notify C.W.'s putative father of termination proceedings, without response. The putative father's parental rights were terminated and he is not an active party to this appeal.

regard to feeding C.W. and keeping her safe from household dangers.

On May 1, 2012, the DCS filed a petition to terminate Mother's parental rights. A hearing was conducted on November 1, November 2, and November 14, 2012. On February 12, 2013, the Gibson County Circuit Court entered its Findings of Fact, Conclusions of Law, and Order terminating Mother's parental rights. She now appeals.

**Discussion and Decision**

I. Due Process – CHINS Services

Mother contends that she was denied due process because a social worker advised Mother that C.W. would not be returned to her and Mother should consider termination of her parental rights. More specifically, Mother claims that this led her to believe that her cooperation with services "was futile." (Appellant's Br. at 7.)

When the State seeks the termination of a parent-child relationship, it must do so in a manner that meets the requirements of the Due Process Clause. Hite v. Vanderburgh Cnty. Office of Family & Children, 845 N.E.2d 175, 181 (Ind. Ct. App. 2006). The parent must be afforded the opportunity to be heard at a meaningful time and in a meaningful manner. Id. Due process in parental rights cases involves the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government interest supporting the use of the challenged procedure. Id.

A parent's interest in the care, custody, and control of his or her children is a fundamental liberty interest; thus, the private interest involved is substantial. Id. The

4

government's interest is also substantial, as the State of Indiana has a compelling interest in protecting the welfare of its children. Id. Procedural irregularities in CHINS proceedings may be so significant that they deprive a parent of procedural due process with respect to the termination of his parental rights. A.P. v. Porter Cnty. Office of Family & Children, 734 N.E.2d 1107, 1112-13 (Ind. Ct. App. 2000), trans. denied.

Mother claims that a social worker, perceived by Mother as an authority figure, discussed the likelihood of parental rights termination, causing Mother to form a belief that her cooperation was futile. Mother has not shown that she was deprived of the opportunity to be heard at a meaningful time and in a meaningful manner. Nor has she claimed that procedural irregularities occurred, or that the DCS failed to make reasonable efforts to preserve and reunify the family during CHINS proceedings. See Ind. Code § 31-34-21-5.5.[3] Mother simply did not fully avail herself of the opportunities offered to her. She has shown no deprivation of due process.

## II. Due Process – Compliance with Indiana Code Section 31-35-2-8(c)

Pursuant to Indiana Code section 31-35-2-8(c), if the trial court terminates the parent-child relationship: "The court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)." Here, the trial court entered extensive findings of fact and conclusions of law. Mother claims that the trial court's conclusions are mere "recitations" of statutory language that "offer no explanation of what, if any, factual

---

[3] We observe that the provision of services is not a requisite element of our parental rights termination statute, and a failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law. In re E.E., 736 N.E.2d 791, 796 (Ind. Ct. App. 2000).

5

findings support these conclusions." (Appellant's Br. at 11.)

As best we can discern, Mother asserts that a conclusion of law falls short of statutory compliance if it does not recite and incorporate the language of each related factual finding which supports it. However, the plain language of the statutory provision at issue does not include such a requirement. We decline to find the trial court's order deficient for lack of statutory compliance.

### III. Sufficiency of the Evidence

#### A. *Standard of Review*

Our standard of review is highly deferential in cases concerning the termination of parental rights. In re K.S., 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). This Court will not set aside the trial court's judgment terminating a parent-child relationship unless it is clearly erroneous. In re A.A.C., 682 N.E.2d 542, 544 (Ind. Ct. App. 1997). When reviewing the sufficiency of the evidence to support a judgment of involuntary termination of a parent-child relationship, we neither reweigh the evidence nor judge the credibility of the witnesses. Id. We consider only the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. Id.

#### B. *Requirements for Involuntary Termination of Parental Rights*

Parental rights are of a constitutional dimension, but the law provides for the termination of those rights when the parents are unable or unwilling to meet their parental responsibilities. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents, but to

6

protect their children.  <u>In re L.S.</u>, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), <u>trans. denied</u>.

Indiana Code section 31-35-2-4(b)(2) sets out the elements that the DCS must allege and prove by clear and convincing evidence in order to terminate a parent-child relationship:

(A) that one (1) of the following is true:

   (i)   The child has been removed from the parent for at least six (6) months under a dispositional decree.
   (ii)  A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
   (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

   (i)   There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
   (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
   (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

If the court finds that the allegations in a petition described above are true, the court shall terminate the parent-child relationship.  I.C. § 31-35-2-8(a).  A trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into

7

consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id.

*C. Analysis*

Mother contends that insufficient evidence supports the termination order. She does not challenge the trial court's determinations pursuant to Sections 31-35-2-4(b)(2)(A) (removal from parent), or (D) (satisfactory plan). She challenges the determination relating to Sections 31-35-2-4(b)(2)(B) (reasonable probability conditions will not be remedied or relationship poses a threat to child's well-being) and (C) (best interests).

Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, and therefore the court needed only to find that one of the three requirements of subsection (b)(2)(B) had been established by clear and convincing evidence. See L.S., 717 N.E.2d at 209. Because we find it to be dispositive under the facts of this case, we consider only whether the DCS established, by clear and convincing evidence, that there is a reasonable probability that the conditions resulting in the removal or reasons for placement outside the home will not be remedied. See I.C. § 31-35-2-4(b)(2)(B)(i). The relevant statute does not simply focus on the initial basis for removal for purposes of determining whether a parent's rights should be terminated, "but also those bases resulting in the continued placement outside the home." In re A.I., 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), trans. denied.

Initially, the DCS intervened and removed C.W. because she failed to thrive and Mother was not securing adequate medical attention for C.W. Mother contends that these

8

conditions have been remedied, because C.W. is no longer being given an inappropriate infant formula and Mother located a potential residence within walking distance of a physician (to which she would presumably move upon regaining custody). Nonetheless, the continued placement of the child in foster care was due to Mother's sporadic compliance with services and her continued inability to develop skills sufficient to provide C.W. with adequate nutrition and a safe environment.

The record is replete with evidence that Mother was unable to comprehend C.W.'s needs and develop the necessary skills to satisfy those needs. Mother's appointment attendance "started off fairly well meeting [with providers], and then kind of fell off the wagon so to say." (Tr. Vol. 2, pg. 78.) She was twice recommended for suspension from individual therapy because of poor attendance. Mother sometimes forgot about appointments or claimed transportation issues (despite recommendations for Medicaid cab and Ride Solutions). She also seemed to have difficulty with prioritization, declining an offer for make-up visitation time in order to leave and obtain a tattoo. Mother expressed the opinion that she didn't need intervention by service providers. For example, she informed a social worker "she was not sure what we would work on since she did not need any help." (Tr. Vol. 2, pg. 10.)

Mother consistently had difficulty appreciating C.W.'s physical needs. Although Mother had repeatedly been advised that smoking in her residence could pose a particular hazard to C.W. because of C.W.'s apneic episodes, there were indications – such as a smoke smell and ash trays – that Mother did not eliminate smoking in the residence. Mother also

9

experienced difficulty with understanding what foods were safe for C.W. to consume. When Mother was provided with a list of permissible foods, this did not remedy her dilemma. During supervised visits, Mother was sometimes dependent upon prompting from service providers to check C.W.'s diaper, clean her up, or feed her. Mother was never able to progress to unsupervised visitation. Finally, despite repeated warnings from service providers that Mother's social contacts and household guests should not pose a risk to C.W., Mother maintained an association with a registered sex offender.

Mother claims that she recently has been able to successfully provide care for other small children; she emphasizes that her attendance during the last three months of visitation was near-perfect; and she describes a plan to relocate within walking distance of a physician's office. In essence, Mother asks that we reweigh the evidence and accord greater weight to her testimony of her recent efforts and future aspirations. We will not do so. See In re A.A.C., 682 N.E.2d at 544. The DCS presented clear and convincing evidence from which the trial court could conclude that there was a reasonable probability that the conditions resulting in the removal or reasons for placement outside the home would not be remedied.

As for C.W.'s best interests, Mother directs our attention to Finding of Fact 31, which discusses the putative father's lack of involvement, and claims that no other finding of fact supports the conclusion that termination is in C.W.'s best interests. We disagree. In determining what is in a child's best interests, the trial court is required to look beyond the factors identified by the DCS and consider the totality of the evidence. In re J.S., 906 N.E.2d

10

226, 236 (Ind. Ct. App. 2009). Here, the trial court's findings included the following: that Mother lacked interest in learning basic home maintenance skills, she "showed no signs of progress with caring for C.W.," C.W. had spent the majority of her life in foster care, the foster parents had provided a safe, stable, pre-adoptive home, and both the Court Appointed Special Advocate and C.W.'s Guardian Ad Litem had opined that termination of parental rights was in C.W.'s best interests. (App. 9.) These findings of fact adequately support the conclusion that termination of Mother's parental rights was in C.W.'s best interests.

## Conclusion

Mother has not shown that she was denied due process in the CHINS proceedings or termination proceedings. The DCS established by clear and convincing evidence the requisite elements to support the termination of parental rights.

Affirmed.

MAY, J., and BRADFORD, J., concur.

11