## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 23 2016, 8:36 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| K.R.,<br>*Appellant-Defendant,*<br><br>v.<br><br>Indiana Department of Child Services,<br>*Appellee-Plaintiff.* | February 23, 2016<br><br>Court of Appeals Case No.<br>33A01-1509-JT-1511<br><br>Appeal from the Henry Circuit Court<br><br>The Honorable Mary G. Willis, Judge<br><br>Trial Court Cause No.<br>33C01-1502-JT-3 |

**Altice, Judge.**

## Case Summary

[1] K.R. (Mother) appeals the involuntary termination of her parental rights to D.B. (Child). Mother challenges the sufficiency of the evidence supporting the termination.

[2] We affirm.

## Facts & Procedural History

[3] Mother and E.B. (Father) have a son together, Child.[1] Mother also has two older daughters, Z.D. and J.D.[2] (collectively, Siblings), from a previous relationship. The family came to the attention of the Department of Child Services (DCS) on August 10, 2013, the day after Child's birth. Child was born with THC in his meconium, and Mother subsequently admitted that she used marijuana during the pregnancy. DCS received a second report on September 17, 2013, after Child was hospitalized with a diagnosis of failure to thrive. As a result, Mother and Father entered into an informal adjustment with DCS and were referred for intensive in-home services that included parenting education.

[4] Despite services, Mother and Father were missing doctor appointments and not meeting Child's basic needs. Child continued to lose weight and was hospitalized again on October 8, 2013, for failure to thrive. DCS detained Child on an emergency basis and placed him in foster care. On October 9, 2013, DCS filed a

---

[1] Although Father's rights were also terminated, he does not participate in this appeal. We therefore limit our discussion of the facts to those relevant to Mother's appeal.

[2] Z.D. and J.D. were born in October 2009 and October 2011, respectively.

petition alleging that Child was a Child in Need of Services (CHINS). Mother and Father subsequently admitted that Child was a CHINS. On December 6, 2013, the trial court ordered Mother and Father to participate in reunification services, including frequent contact with their Family Case Manager (FCM), home-based counseling, parenting assessments, random drug screens, and supervised visitation.

[5] Child has remained with the same foster family throughout this case. He began to gain weight almost immediately under their care and has otherwise thrived and received the medical care he needs. Siblings were removed from Mother and Father's home in January 2014[3] and placed in the same foster home as Child. They were also adjudicated CHINS under separate cause numbers.

[6] Although Siblings are generally healthy, Child has a number of medical issues as set out in the trial court's findings:

15. The Child was born with Fetal Alcohol Syndrome that caused significant medical issues in the Child's young life which continued to the date of the hearing and will be lifelong medical conditions and needs.

16. A month after the Child's birth, after being in the care of Mother and Father, the Child was diagnosed with Failure to Thrive based on his easily observable failure to gain weight as a healthy baby would….

---

[3] Siblings were removed after Father went into a violent rage and the police were called to the home. The home was in poor condition with a lot of trash, little food, and no running water. The girls had bed bugs and lice so badly that they had blood infections for which they had to receive medical treatment.

17. To this day, Child suffers from numerous medical issues, including:

   a. Heart Murmur,
   b. Aortic Enlargement and Leakage which will require lifelong heart medication and cardiology appointments,
      i. The Child's Nurse Practitioner opined this is caused by a genetic disorder,
   c. Drifting Eye,
   d. Irregular Pupil Dilation,
   e. Ankles that require leg braces, and
   f. A 1 to 2 month developmental delay which requires regular therapy.

18. The Child's numerous medical and developmental issues have required, and will require, him to go to many more doctor's visits, medications, physical therapy routines, and constant supervision than would be required of a healthy Child the same age. This child has an average of three medical appointments per month; in addition to physical therapy three times per week – one at home and two at the clinic; and recommended occupational and equine therapy in Indianapolis.

*Appellant's Appendix* at 51-52.

[7] Review hearings were held on March 7, 2014, and June 27, 2014. At the conclusion of each hearing, Child was ordered to remain in foster care due to continued lack of compliance with the case plan by Mother and Father. On July 21, 2014, Mother and Father signed a safety plan, which emphasized that they were to attend Child's doctor visits. The family's FCM, Abigail Neuman, painstakingly went over Child's appointment schedule with Mother several times

each month. Mother, however, continued to miss the majority of these appointments for various reasons including oversleeping and not having a ride.

[8] Following a hearing on October 10, 2014, the trial court changed the permanency plan for Child from reunification to concurrent plans of reunification and adoption. Although Siblings also remained in foster care, their permanency plan continued to be reunification. However, following a hearing on January 16, 2015, the permanency plan for all three children was changed to adoption, and the court authorized DCS to cease reunification efforts and initiate the termination of parental rights.

[9] On February 2, 2015, DCS filed termination petitions with respect to Child and Siblings. By June 2015, Siblings were returned to Mother's care for a trial home visit. Termination proceedings continued with respect to Child with evidentiary hearings on July 23 and August 3, 2015.

[10] FCM Neuman testified at the July hearing that although Mother had made recent progress regarding housing, drug treatment, and participation in services, safety and parenting concerns still existed. While Mother was providing for Siblings' basic needs, FCM Neuman explained: "I have concerns with supervision. I think [Mother] needs a lot of prompting to complete things. She doesn't show a lot of follow through at times." *Transcript* at 113. FCM Neuman noted that her biggest concern with respect to Child was his medical needs and testified:

> [Mother] has not been able to prove that even with all the added
> assistance of having someone tell her time and time again when
> the appointments are and where they are … she still wasn't able

to go. I am just concerned that she wouldn't be able to without that person telling her and reminding her all the time.

*Id.* Even with progress in other areas around December 2014, FCM Neuman testified that Mother was still missing some medical appointments. With respect to supervision, FCM Neuman indicated that Mother was struggling at times with Siblings and noted that Child would require even more supervision and has "very different needs" than the girls. *Id.* at 125. Ultimately, FCM Neuman recommended the termination of Mother's parental rights over Child.

[11] In a detailed report filed July 21, 2015, the CASA similarly recommended termination of parental rights. The CASA observed that despite receiving extensive in-home services, routine daily needs are often difficult for Mother. Mother lacks initiative and requires multiple prompts to complete needed tasks. The CASA also noted that Mother continues to miss medical appointments and, although she has made concerted efforts, still struggles with basic parenting skills. In sum, the CASA concluded:

> It is in [Child's] best interest to be cared for by individuals who maintain appointments and are able to provide for his medical and emotional needs. CASA believes it to be in his best interest to have the parent child relationship terminated and that a permanency plan of adoption is pursued.

*Appellant's Appendix* at 41.

[12] On August 20, 2015, the trial court issued its order terminating Mother's and Father's parental rights to Child. In addition to the findings set out above, the trial court made the following detailed findings, among others:

19. The physical manifestation of the Child's diseases will require consistent physical therapy both at home and in the physical therapist's office for the foreseeable future. Mother has been without a valid driver's license in excess of five years and has significant transportation issues which will affect her ability to meet the rigorous demands of the medical appointment schedule.

20. Predictably, DCS and service providers provided services for Mother to participate in the Child's medical care so that when/if reunification occurred, it could be assured that Mother and Father would be able to handle the rigors of the Child's significant medical care needs.

21. In order to assist Mother and Father with the medical issues, DCS provided the following:

   a. Foster Mom informed Mother of every appointment at least a few days prior to it occurring,
   b. Foster Mom did attempted [sic] to facilitate the participation of Mother and Father in the medical care process,
   c. At multiple team meetings, it was stressed to Mother that regularly attending the medical appointments for the Child was a crucial component of ensuring the Child's safety in her care (See DCS Exhibits 75 through 78),
   d. Because of minimal compliance by parents in medical appointments, Mother and Father were required to sign a Safety Plan on July 21, 2014 (six months after the Court's dispositional order) in which they both agreed to attend the Child's doctor's visits (See DCS Exhibit 73), and

e. Later, in December of 2014, in yet another attempt to help Mother with attending the Child's appointments, Mother was provided a duplicate list of the name and location of every doctor the Child was seeing or may see. This was not the first time a list of this nature was given to the parents (See DCS Exhibit 23).

22. Despite the repeated and concerted efforts to encourage Mother and Father, they never became consistent participants in the Child's medical care, missing well over 50% of the Child's medical appointments.

* * *

b. When given the opportunity to provide medical history at a medical appointment Mother did attend, Mother failed to provide the correct medical history to the doctor because of her lack of knowledge of the child's medical needs and history,

c. …. Although Mother made some improvement in services after separating from Father in November of 2014, she still did not improve her performance when it came to becoming a meaningful participant in the Child's medical care (as evidenced by FCM and Foster Mom providing Mother yet another list of the Child's doctors in DCS Exhibit 23), and

d. After a year of constant reminders, it became clear that there existed a reasonable probability that this aspect of Mother's parenting would not improve or be remedied despite the coercive intervention of the court.

23. Not only was Mother struggling with the Child's medical care for which she was wholly unfamiliar, she was struggling with ordinary day-to-day care … as well.

24. By December 2014, fourteen (14) months after the case was opened, Mother was still only receiving two hour long supervised visits with the Child due to safety concerns….

25. Due to the Child's significant and ongoing medical issues, he requires constant and close supervision, because he is

constantly mobile contending with leg braces and because of his sensory issues and hyperactivity places things in his mouth much more than a normal Child of his age does. Because of his condition, he is weaker on his right side and wears braces on his feet and he is prone to falling.

26. Even in November of 2014, Mother was still struggling to properly supervise the Child while also supervising her two older children who did not have any special medical needs and were school age (See DCS Exhibits 19 through 22).

27. Mother also was never able to develop proper feeding habits for the Child…as she consistently struggled to feed the Child while in her care, despite having a year of supervised visit time to address the issue. Special nutrition is especially important for this child because of his medical needs and heart medication.

28. Mother also delayed completing her substance abuse treatment….

   b. [D]espite being court ordered to do so, Mother did not commence services with Robert Johnson at Anchor Behavioral Services until April of 2014 – *six months after her child had been removed*, and did not complete the three (3) month long program there until January 2015 – *nine additional months later*. (See DCS Exhibits 24-27).
   c. The delay Mother caused in commencing and completing substance abuse treatment caused a delay in completing other necessary services or improving other skills that would have assisted in her reunification and learning the skills necessary to provide for her medically dependent child.
   d. The Court finds that this significant delay in commencing and completing services … demonstrates that the conditions that resulted in the child's removal and the reasons for placement at the age of 2 months outside the

home of the parents will not be remedied now that the child is 24 months of age.

29. During the lifespan of this CHINS case, [Siblings] were detained, and the girls were not placed back in the care of Mother for a trial home visit until June of 2015 under a strict safety plan. Mother has the support of the father of [Siblings] who are without medical needs.

   a. Even now…Mother still needs close supervision by service providers to ensure that these two healthy children live in a safe and nurturing environment,

   b. Mother has to be reminded to provide basic necessities numerous times by either the FCM or service providers before she fixes or addresses an issue, and

   c. In only two months, the girls have already had lice and been seen playing unsupervised near the busy street….

30. Mother has not yet endangered these girls' safety so much that they have needed to be re-detained, but it is this Court's finding that should this Child with extensive medical needs and extensive supervision requirements be introduced back into the home, that the safety of *all three* Children would be in doubt. The half-siblings are not a "package deal" and the needs between the two sibling groups differ significantly.

* * *

35. Between the first Dispositional Order entered on December 6, 2013 and the completion of the Fact-Finding Hearing on the Termination on August 3, 2015, Mother has failed to comply with the case plan and dispositional order in the following ways:

   a. Mother failed to keep all appointments, as the first 12 months of the case showed a litany of missed appointments for Mother in all areas of her services,

b. Mother still does not have suitable housing, as it took her 12 months to find anything resembling suitable housing…,

c. While Mother's drug use was "better" than Father's, she still failed to abstain from the use of drugs for the first six months of the case, and

d. Mother did not adequately care for the Child during the time period she was allotted ….

    i. Mother failed to attend over half of the Child's medical appointments…,

    ii. Mother failed to properly utilize her time visiting with the Child to show she was capable of handling the Child's medical and physical therapy needs, and

    iii. Mother was never able to achieve greater than two (2) hour long supervised visits….

* * *

37. Mother['s] … compliance with the case plan and dispositional orders can be summed up as such:

a. ….

b. Mother did not show any modicum of improvement until November of 2014, 13 months after the case was opened at which time the child had only spent two months of his life in her care,

c. In those 13 months, Mother routinely missed medical appointments and was minimally compliant with services that would have assisted in her reunification effort, and

d. Mother's level of noncompliance is more than mere difficulty in meeting the needs of her child, they rise to the level of her inability to meet the child's significant medical needs without lifelong state intervention;

e. Even after November 2014, Mother did not show enough improvement in her parenting skills to lead this Court to believe that reunification was in the best interests of the Child, as she continued to miss medical appointments and

use sleep as an excuse, despite her improvement in other areas of services and at no point did she progress past supervised two hour visits with her child.

*Appellant's Appendix* at 52-62 (emphases in original).

[13] Based upon its extensive findings, the trial court concluded that there existed a reasonable probability the conditions that resulted in Child's placement outside Mother's home will not be remedied and that continuation of the parent-child relationship poses a threat to Child's well-being. The court determined further that termination was in Child's best interest and that a satisfactory plan for his care and treatment existed – adoption. The trial court granted DCS's petition to terminate Mother's and Father's parental rights with respect to Child. Mother now appeals.[4]

## Discussion & Decision

[14] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In*

---

[4] Although he had counsel present, Father did not attend the termination hearing. His whereabouts were unknown.

*re L.S.,* 717 N .E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[15] The trial court entered findings in its order terminating Mother's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[16] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[17] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child. I.C. § 31-35-2-4(b)(2)(C).

[18] On appeal, Mother argues that the evidence was insufficient to support the involuntary termination of her parental rights. She challenges the trial court's conclusions as to subsection (b)(2)(B)(i) and (ii), as well as the determination regarding Child's best interests. In sum, Mother's argument is based on her assertion that "nearly every service provider who testified either expressly or impliedly indicated that s/he did not agree with the decision to initiate termination proceedings rather than continue with services." *Appellant's Brief* at 10.

[19] We observe initially that DCS was required to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the

juvenile court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). As set forth above, the trial court found that DCS presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in Child's removal or continued placement outside Mother's care will not be remedied and that the continuation of the parent-child relationship poses a threat to Child's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). We focus our inquiry on the former requirement—that is, whether there was sufficient evidence to establish a reasonable probability that the conditions resulting in Child's removal or continued placement outside Mother's care will not be remedied.

[20] In making such a determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* Further, the court may consider the parent's history of neglect and response to services offered through DCS. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

[21] Initially, Mother challenges some of the trial court's findings of fact. Specifically referencing finding number 19, Mother argues that Child's future medical appointments will not be that rigorous and that she will have adequate transportation to attend appointments because she is planning to pay the reinstatement fee for her license and can get rides from family members. We reject

Mother's request to reweigh the evidence. There was ample evidence to support the court's finding that Mother has significant transportation issues that affect her ability to meet the rigorous demands of Child's medical appointment schedule.

[22] Mother's remaining challenges to the court's findings are general and do not specifically reference any findings. We will briefly address her arguments in this regard to the extent we can decipher them. First, Mother asserts that after she ended her unhealthy relationship with Father in November 2014, she attended all of Child's medical appointments. This assertion does not find support in the record. Indeed, FCM Neuman testified that although Mother made progress in some other areas around December 2014, Mother was still missing medical appointments. *See Transcript* at 114-15. FCM testified that throughout the case Mother attended less than half of Child's medical appointments and that this stayed the same even after Mother signed the safety plan in July 2014. Accordingly, the trial court's statement in finding number 22 that Mother "never became [a] consistent participant[] in the Child's medical care, missing well over 50% of the Child medical appointments", is not clearly erroneous. *Appellant's Appendix* at 53.

[23] Mother next asserts that any concerns with her parenting and supervision skills had been remedied before the termination proceedings began. On the contrary, there was evidence that Mother was still "in need of intense parenting skills to help stabilize the home and provide a safe environment" for Siblings. *Transcript* at 69. FCM Neuman testified that safety issues existed in Mother's home at the time of the termination hearing. She explained that although Mother was providing for

Siblings' basic needs, concerns with respect to her supervision of the children remained. FCM Neuman testified: "I think [Mother] needs a lot of prompting to complete things. She doesn't show a lot of follow through at times. She just needs a lot of reminders as far as parenting goes." *Id.* at 113. With respect to Child, FCM Neuman testified that Mother has not remedied her parenting issues and has continued to miss medical appointments even with constant reminders from service providers. FCM Neuman noted: "I still have some concerns about her supervision of the girls and with them being two and four years older tha[n Child] my concerns would be magnified a lot if [Child] was in the home. He requires a lot of supervision more so than even what the girls need." *Id.* at 114. Despite belated efforts by Mother to cooperate with service providers and make improvements in her home, FCM Neuman unequivocally recommended termination of Mother's parental rights with respect to Child.

[24] The CASA similarly recommended termination of parental rights. Specifically, the CASA noted that daily needs are often difficult for Mother and that she lacks initiative and requires multiple prompts to complete needed tasks. The CASA also observed that although Mother has made concerted efforts, she still struggles with basic parenting skills and continues to miss or come late to medical appointments. In sum, the CASA concluded:

> It is in [Child's] best interest to be cared for by individuals who maintain appointments and are able to provide for his medical and emotional needs. CASA believes it to be in his best interest to have the parent child relationship terminated and that a permanency plan of adoption is pursued.

*Appellant's Appendix* at 41.

[25] The trial court's detailed findings are supported by the evidence. The findings, in turn, support the court's conclusion that there is a reasonable probability the conditions resulting in Child's removal or continued placement outside Mother's care will not be remedied. As explained by the trial court, "Mother has a nearly two-year long pattern of neglect regarding the medical issue" and has proven "unable to meet [Child's] significant medical needs without lifelong coercive State intervention." *Id*. at 65. Further, the trial court expressly rejected Mother's claim that the conditions resulting in Child's removal had been remedied:

> i. While Mother had drug issues at the beginning of the case, that was not the sole or main reason for removal of the Child, Mother's lack of attention to the Child's medical needs was…,
>
> ii. While the Child is now achieving health despite his chronic medical conditions including his heart condition, that is not the prism for [sic] which this Court views the case,
>
> iii. The Child was nursed back to health and has continued in good health despite his ongoing heart condition while outside the care of Mother, and because of this, the Child's current "healthy" (despite having continuing medical issues) status is not credited towards Mother in regards to proving the elements of the termination petition,
>
> iv. Mother had over 14 months to show DCS and this Court that she was willing and able to be an active and appropriate participant in the Child's medical care; which she failed to do at every turn,
>
> v. Even at the fact-finding hearing on this petition, Mother was still having difficulty balancing her shift employment with her

need for sleep and providing adequate care for her two older school age children even with the help of their father,

vi. Therefore, due to the 14 months of failure and apparent continued lack of awareness of the gravity of the Child's medical needs, this Court believes that there is … a reasonable probability the conditions that lead to the Child's placement outside the home will not be remedied….

*Id*. at 68-69.

[26] The trial court's findings also support its conclusion that termination is in Child's best interests. Contrary to Mother's suggestion that service providers were against termination, the record establishes that both FCM Neuman and the CASA recommended termination as being in Child's best interests. *See In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009) ("the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests").

[27] Judgment affirmed.

[28] Robb, J. and Barnes, J., concur.