## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 23 2017, 6:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
SA.H.

Frederick A. Turner
Bloomington, Indiana


ATTORNEY FOR APPELLANT
R.H.

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of: | May 23, 2017 |
| | Court of Appeals Case No. 60A05-1608-JT-1842 |
| S.H. & L.H., (Children), | |
| and, | Appeal from the Owen Circuit Court |
| | The Honorable Kelsey B. Hanlon, Judge |
| Sa.H. (Mother), and R.H. (Father), | |
| | The Honorable David Holt, Senior Judge |
| *Appellants-Respondents,* | Trial Court Cause No. 60C02-1603-JT-64 60C02-1603-JT-65 |

v.

Indiana Department of Child
Services,

*Appellee-Petitioner.*

**Barnes, Judge.**

# Case Summary

R.H. ("Father") and Sa.H. ("Mother") appeal the termination of their parental rights to their children S.H. and L.H. We affirm.

# Issue

Although they filed separate Appellants' briefs, Father and Mother both argue that the evidence is insufficient to support the termination of their parental rights.

# Facts

Father and Mother are married and are the parents of S.H., who was born in June 2009, and L.H., who was born in April 2008. At some point Father and Mother separated, and Father moved to South Carolina. The children visited Father during the summer of 2014, and upon their return to Indiana, Mother believed that Father had sexually abused S.H. In November 2014, Mother was arrested for battery after she had a physical altercation with maternal

grandmother. Mother was intoxicated at the time and was physically disciplining L.H. "in an excessive manner," and maternal grandmother intervened. Tr. p. 14. Mother told Department of Child Services ("DCS") workers that she had substance abuse and mental health issues, including "hearing voices and multiple personality disorder," that she was fearful of L.H., that she had consumed alcohol and then drove to the grocery store with L.H., that Father had physically and sexually abused her, that Father was physically abusive to the children, and that she believed Father had sexually abused S.H. *Id.* at 12. Father denied physically abusing the children and sexually abusing S.H. Although DCS was concerned because S.H. had disclosed the alleged abuse to several family members, DCS was unable to substantiate the sexual abuse due to S.H.'s lack of verbal skills.

[4] DCS filed petitions alleging that S.H. and L.H. were children in need of services ("CHINS"), and the children were initially placed with their maternal grandmother. In February 2015, after a fact-finding hearing, the trial court found the children to be CHINS and made the following findings:

> 1.     Respondent Mother engaged in a physical altercation [sic] family members in the children's presence, and was arrested for battery.
>
> 2.     Respondent Mother is currently incarcerated and unable to care for the children.
>
> 3.     Respondent Mother has untreated mental health concerns that impair her ability to appropriately supervise and care for the children.

4. Respondent Mother has untreated substance issues that impair her ability to appropriately supervise and care for the children.

5. Respondent Father has been physically violent with [L.H.] and there is some evidence of sexual impropriety between Respondent Father and [S.H.]. [S.H.'s] speech difficulties have made the allegations of sexual abuse difficult to investigate and raise additional concerns about her safety in any setting.

Respondent's Ex. A. The trial court ordered Father and Mother to participate in a psychological evaluation, supervised visitation, a parenting assessment, and ordered Mother to participate in a substance abuse assessment and to complete random drug screens.

[5] Also in February 2015, Mother told DCS that she was moving to South Carolina to live with Father. DCS informed parents that reunification with the children was going to be difficult if they were not in Indiana to engage in visitations and services and that DCS was unable to pay for them to engage in services in South Carolina. Mother and Father said they would return once a month to visit the children and that they would do the services in South Carolina. However, the monthly visits did not occur.

[6] Father and Mother participated in a psychological assessment at Centerstone. During his assessment, Father was "guarded and didn't give a lot of information," and the therapist was unable to make a diagnosis or referral. Tr. p. 25. Mother has a "significant trauma history" in both her childhood and as an adult that affects her functioning. *Id.* at 95. She has been diagnosed with

alcoholism, borderline personality disorder, PTSD, and sexual masochism. Mother was referred to intensive outpatient addictions counseling for her alcoholism and methamphetamine use and mental health therapy for sexual abuse. Mother participated in some counseling in South Carolina and started participating in an IOP substance abuse program, but she did not complete the program. Although Father completed the Centerstone assessment and a few supervised visitations, he has refused to participate in any other services because "he does not feel he needs to participate because he has not done anything wrong." *Id.* at 116.

[7] During supervised telephone visitations, the children became anxious and agitated and would sometimes run out of the room. The children would also bury their heads in the couch during the calls and complain that they did not want to talk. Father participated in only one of the calls. During one call, Mother's speech was very slurred. After the calls, L.H. would have outbursts at home, and S.H. would be withdrawn.

[8] Mother's relationship with Father is marked by physical and verbal abuse. In April 2016, Mother and Father again separated. At the time of the termination hearing, Mother was living with friends in Illinois. The Illinois home, however, was very unstable, volatile, and unsuitable for children. During May and June 2016, Mother had three crisis episodes that required the intervention of her therapist. During one of the episodes, Mother relapsed and drank a fifth of vodka in an hour and was having suicidal thoughts. Her therapist called the police, and Mother was taken to the hospital. Although Mother has engaged in

services, she has made little progress in obtaining stable housing, obtaining employment, improving her mental health, or ending her substance abuse.

[9] In March 2016, DCS filed petitions to terminate Father's and Mother's parental rights. After a hearing in June 2016, the trial court terminated Father's and Mother's parental rights. Father and Mother now appeal.

## Analysis

[10] Father and Mother challenge the termination of their parental rights to S.H. and L.H. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[11] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *Id.* We consider only the evidence and

reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Father's and Mother's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[12]     Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B)     that one (1) of the following is true:
>
>> (i)     There is a reasonable probability that the
>>         conditions that resulted in the child's removal
>>         or the reasons for placement outside the
>>         home of the parents will not be remedied.

(ii)    There is a reasonable probability that the
        continuation of the parent-child relationship
        poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions,
        been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child;
        and

(D)     that there is a satisfactory plan for the care and
        treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v.*

*Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

## I. Factual Findings

[13]  Father argues that three of the trial court's findings are not supported by the

evidence. First, Father contends that the following finding is erroneous:

> Mother was released from incarceration on February 18, 2015.
> On February 24, 2015, both parents met with Meagan Berkebile-
> Guy, the DCS Family Case Manager assigned ("FCM") and her
> supervisor, Ashley Collins, regarding the Pre-Dispositional
> Report of DCS and the proposed plan of DCS for the family. At
> that time, Mother and Father informed DCS that they intended
> to leave the State of Indiana where the children were placed, to
> reside in the State of South Carolina. At that time, the FCM
> advised the parents that this move would make it extremely
> difficult for the parents to complete necessary reunification
> services, and that, while the parents expressed their intent to
> engage in services in South Carolina, Indiana DCS could not pay

for such services. Mother and Father chose to reside in South Carolina despite this information.

Father's App. Vol. II p. 63. According to Father, this finding is erroneous because he was already living in South Carolina in February 2015. Although this finding does not mention that Father was already living in South Carolina, the evidence presented at the hearing shows that nothing in the finding is technically incorrect—both parents did go to South Carolina after the February 2015 meeting, DCS did inform both parents that it would be difficult for them to participate in services while living in South Carolina, and the parents chose to live in South Carolina anyway.

[14] Next, Father argues that the following finding is erroneous: "The children exhibited behaviors tending to reflect fear of their parents and reluctance to have contact with them." *Id.* at 65. Father contends there was no evidence presented that the children were afraid of Father and Mother. During supervised telephone visitations, the children became anxious and agitated and would sometimes run out of the room. The children would also bury their heads in the couch during the calls and complain that they did not want to talk. The trial court could have reasonably inferred that the children were fearful of the parents.

[15] Father also argues that the following finding is clearly erroneous:

> Father testified that he does not feel the need to engage in services since he has done nothing wrong. He did acknowledge attempting to enroll in an on-line parenting education course, but

was told that DCS would not consider that service as successful completion of the requirement, and felt that DCS should have researched South Carolina service providers to refer for him. He has done nothing to address the allegations of sexual misconduct with [S.H.] that were made, despite understanding that was an impediment to reunification.

*Id.* at 66. Father contends that he did participate in the psychological evaluation and supervised visitations and that he tried to find service providers in South Carolina but DCS would not accept them. Father blames DCS for failing to find an acceptable service provider. Father also argues that the sexual abuse allegations were unsubstantiated. Father contends that he "completed all but one of his requirements for reunification with his children, but DCS thwarted any attempt he made to compete the last requirement." Father's Appellant's Br. p. 19.

[16] DCS presented evidence that Father was ordered to participate in a psychological evaluation, supervised visitation, and a parenting assessment. Although Father participated in a psychological assessment, Father was "guarded and didn't give a lot of information," and the therapist was unable to make a diagnosis or referral. Tr. p. 25. Father made it clear that "he does not feel he needs to participate [in services] because he has not done anything wrong." *Id.* at 116. Father participated in only one of the telephone visitation calls with the children. As for the services in South Carolina, the DCS case manager testified that Mother and Father sent her information for an online parenting assessment that was "more for people that are going through divorce

cases." *Id.* at 117. She informed Mother and Father that the online class would not be acceptable for DCS as a parenting assessment. She was unaware of any other services that Father attempted to do in South Carolina. Finally, as for the molestation allegation, DCS acknowledges that it could not substantiate the allegation. However, DCS was concerned because S.H. had disclosed the alleged abuse to several family members and S.H.'s lack of verbal skills impeded the investigation. Father made no attempt to resolve the issue despite these concerns. We cannot say that the trial court's finding is clearly erroneous.

## II. Changed Conditions

[17] Both Father and Mother challenge the trial court's finding of a reasonable probability that the conditions resulting in S.H. and L.H.'s removals or the reasons for placement outside the home of the parents will not be remedied.[1] In making this determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512

---

[1] Father and Mother also argue the trial court's conclusion that the continuation of the parent-child relationship poses a threat to the well-being of the children is clearly erroneous. We need not address this argument. Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive. Subsection (b)(2)(B)(iii), which concerns repeated CHINS adjudications, is inapplicable here. Consequently, DCS was required to demonstrate by clear and convincing evidence a reasonable probability that either: (1) the conditions that resulted in the children's removal or the reasons for placement outside the home of the parents will not be remedied, or (2) the continuation of the parent-child relationship poses a threat to the well-being of the children. The trial court found a reasonable probability that the conditions that resulted in the children's removal and continued placement outside Father's and Mother's homes would not be remedied, and there is sufficient evidence in the record to support the trial court's conclusion. Thus, we need not determine whether there was a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children. *See, e.g., Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 148 n.5 (Ind. 2005); *In re T.F.*, 743 N.E.2d 766, 774 (Ind. Ct. App. 2001), *trans. denied*.

(Ind. Ct. App. 2001), *trans. denied*. However, the trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.*

[18] On this factor, the trial court found:

> The Court finds clear and convincing evidence that there is a reasonable probability that the conditions that resulted in the children's removal and the reasons for their placement outside the homes of their parents will not be remedied.
>
> a. The conditions that resulted in removal of these children were domestic violence in the home perpetrated by Mother, while Mother was intoxicated, and while Children were in the home; Mother's untreated mental health issues and substance abuse issues; and Father's physical violence and possible sexual molestation committed against Children.
>
> b. Mother has not made any significant, meaningful progress toward alleviating any of those conditions. At the time of removal Mother had a serious, long-standing issue with alcoholism that interfered with her ability to make safe, sound decisions for herself or for her children. Mother continues to this date to have a serious issue with alcoholism that interferes with her ability to make safe, sound decisions for herself or for her children. The Court finds uncontroverted evidence that as recently as two weeks before this hearing she was recklessly and dangerously abusing alcohol and expressed suicidal ideations. She continues to have a serious issue with alcohol abuse even after completing a rehabilitation program and even after a Petition was filed to terminate her parental rights. She continues to reside in an unsafe, unstable home where drug use and other criminal behavior has occurred. Mother continues to exhibit serious mental health issues, including threatening self-harm, and

engaging in self-harming behavior. While she is receiving therapeutic treatment for her mental health issues, the evidence is clear and convincing that she is nowhere near gaining any kind of meaningful or lasting control over those issues. At the time of removal, she had untreated mental health issues that caused her to make poor decisions both for herself and for her children; poor decisions like getting out of jail and immediately moving more than 600 miles away from her children to be with the man who she says has been physically and emotionally abusive to her and who she believes sexually molested their daughter; poor decisions like drinking and continuing to consider suicide. It is more than reasonable to conclude based on the foregoing that she will never be able to manage the lives of these children.

c.      Father has failed to make any significant, meaningful progress toward alleviating any of these conditions. Father has denied the need for his participation in a reunification plan throughout the underlying CHINS proceeding, and has therefore not engaged in any services that would permit the Court to consider placing these children in his care. He has engaged in no services designed to improve his parenting skills or decision-making. He has chosen to provide no financial support for the children despite having been ordered to do so, and despite his ability to contribute. This is another example of the father attending to his own interests rather than those of these children.

Father's App. Vol. II p. 69.

[19]     On appeal, Father argues that the conditions resulting in the children's removal from him—Mother's allegations that he had molested S.H.—were unsubstantiated and cannot form the basis for termination of his parental rights. Father also argues that he completed the psychological evaluation and participated in telephone visits with the children. Father contends that he only

failed to complete the parenting assessment, but he blames DCS's refusal to accept providers that he found in South Carolina. Finally, Father argues that he, in fact, had been paying child support.

[20] DCS presented evidence that Father consistently denied that he needed to participate in services because he did not believe that he had done anything wrong. Although Father participated in a psychological assessment, Father was "guarded and didn't give a lot of information," and the therapist was unable to make a diagnosis or referral. Tr. p. 25. His participation in visitations, even telephone visitations, was very limited. Although DCS was unable to substantiate the molestation allegations due to S.H.'s speech impediment, there were still concerns about the allegations. As for Father's failure to pay child support, the evidence demonstrated that Father paid child support during the dissolution proceedings, but after the dissolution proceedings were dismissed, he failed to pay child support to the relative care placement. In general, Father simply refused to comply with the trial court's orders and refused to participate in the necessary services to have the children returned to him. The trial court's finding is not clearly erroneous.

[21] As for Mother, she concedes that there were issues with domestic violence, mental health, substance abuse, and Father's physical violence and possible sexual molestation of the children. However, she claims that she had been making progress, had moved away from Father, had abstained from alcohol for six months, and was participating in therapy. The evidence demonstrated that Mother had a significant substance abuse issue, that she had significant mental

health concerns, and that she still did not have a stable living environment or employment. Although she had made minor progress, she had also relapsed and consumed shortly before the termination hearing. It was clear that Mother simply was not in a position to parent the children and will not be for the foreseeable future. The trial court's finding is not clearly erroneous.[2]

## II. Best Interests

Father and Mother also challenge the trial court's finding that termination of their parental rights is in the children's best interests. In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *D.D.*, 804 N.E.2d at 267. In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.*

On this issue, the trial court found:

> The Court finds by clear and convincing evidence that termination is in the best interests of each of the children. The children have now been out of the care of their parents since November, 2014, a period of more than eighteen (18) months. During the bulk of that time, they have been in the home of their aunt and uncle, and their behaviors have improved dramatically in that home. They have been safe, happy, nurtured and

---

[2] Mother also argues that her due process rights were violated. She contends that DCS should have provided her with therapy services earlier in the CHINS proceedings when she was still living in South Carolina. DCS had informed Mother when she moved to South Carolina that providing out-of-state services to her would be a problem, but Mother moved anyway. She also argues that the CHINS court indicated that the children would be returned in November 2015, but in November 2015, the trial court indicated that reunification might not happen. In June 2015, the trial court listed a "projected date" for the children's return as November 2015. Ex. 4. The date was "projected" not promised, and the parents lack of progress changed the plan. Mother's due process argument fails.

> protected. They are entitled to the permanency that termination
> and adoption will provide them.

Father's App. Vol. II p. 69.

[24] Father argues that DCS failed to "fulfill its statutory obligation to assist Father in reunifying with his children." Father's Appellant's Br. p. 23. Mother argues that it was in the children's best interests that she be given more time to improve her circumstances. Neither parent focuses on the best interests of the children; rather, they focus on themselves and the services DCS has allegedly failed to provide. The totality of the evidence, however, shows that termination is in the children's best interests. After the children were removed, both children were withdrawn. L.H. was very angry and aggressive, and S.H. had a speech impediment. The children are now well adjusted, outgoing, happy, and playful in their current placement. Neither parent has made much progress with services or demonstrating an ability to care for the children. Both the DCS case manager and the guardian ad litem recommended termination of Father's and Mother's parental rights. Under these circumstances, the trial court's finding is not clearly erroneous.

### III. Satisfactory Plan

[25] Father and Mother also argue that the trial court's conclusion that there is a satisfactory plan for the care and treatment of the children is clearly erroneous. In order for the trial court to terminate the parent-child relationship the trial court must find that there is a satisfactory plan for the care and treatment of the

child. *D.D.*, 804 N.E.2d at 268. This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *Id.*

[26] In addressing this factor, the trial court found:

> The plan for the children is adoption by their relative caregivers. The Court finds by clear and convincing evidence that this is a satisfactory plan. Although the Court in the underlying CHINS proceedings initial [sic] had sufficient reservations about the aunt and uncle to order the children removed, the Court had a subsequent hearing at which it heard significant evidence that resulted in the Court ordering that they be returned to the aunt and uncle's care.

Father's App. Vol. II p. 69.

[27] Father and Mother argue that the children's placement in the home of their maternal aunt and uncle is unsatisfactory, and they question the mental health and disciplinary techniques of the aunt and uncle. The focus, however, on this factor is whether DCS's general plan is satisfactory, not whether the specific placement is satisfactory. DCS's general plan is the adoption of the children, and this is a satisfactory plan. *See D.D.*, 804 N.E.2d at 268 (holding that DCS's plan for the child to be adopted gave a general sense of direction for the child's care).

## Conclusion

[28] The evidence is sufficient to support the termination of Father's and Mother's parental rights to S.H. and L.H. We affirm.

Affirmed.

Kirsch, J., and Robb, J., concur.